# Illinois Official Reports

## Appellate Court

---

### *People v. Trajano*, 2018 IL App (2d) 160322

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TITA G. TRAJANO, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-16-0322 |
| Filed | August 22, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Boone County, No. 11-CF-364; the Hon. C. Robert Tobin III, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Yasemin Eken, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Tricia L. Smith, State's Attorney, of Belvidere (Patrick Delfino, David J. Robinson, and Adam Trejo, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE BURKE delivered the judgment of the court, with opinion.<br>Presiding Justice Hudson and Justice Hutchinson concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a jury trial in the Boone County circuit court, defendant, Tita G. Trajano, was convicted of criminal neglect of an elderly person (720 ILCS 5/12-21(a)(2) (West 2008) (now 720 ILCS 5/12-4.4a(b)(1)(B))) and sentenced to 18 months of conditional discharge. On appeal, she argues that the State failed to prove beyond a reasonable doubt that she (1) knowingly failed to perform acts that she knew or reasonably should have known were necessary to maintain the health of the victim, Richard Brown, and (2) did not make a "good[-]faith effort" to care for Richard. *Id.* § 12-21(a)(2), (d). We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    Evidence presented at trial revealed that, in February 2009, Dan Brown, Richard's son, contracted with BrightStar Healthcare (BrightStar) to provide live-in home health care for his mother, Eileen Brown, who lived with Richard in an apartment attached to Katherine and Chris Landgraff's home. Katherine is Dan's sister. Although the family primarily sought care for Eileen, who had severe Alzheimer's disease, they also sought care for Richard, who, at 85, was blind in one eye, deaf in one ear, and had difficulty moving around without a cane or walker. Additionally, the family believed that Richard had dementia, although Richard was never formally diagnosed with this. Care for Richard included preparing his meals; doing his laundry; helping him bathe, dress, and use the bathroom if he wanted help; and generally keeping him safe.

¶ 4    BrightStar contracted with Joyful Hearts Home Health Support, Inc. (Joyful Hearts), to provide the necessary services. Joyful Hearts, which was owned at least in part by Esmeralda Roxas, placed Kaye Jensen in the Browns' home. Defendant substituted for Jensen.

¶ 5    Defendant is a small Filipino woman in her seventies. In the Philippines, she took premed classes, which consisted of psychology, physiology, and biochemistry, and later switched her major to nutrition. Just prior to graduating, defendant got married, and she never received her degree. Defendant and her husband had five children and moved to the United States in 1979. In 2008, defendant began working for Joyful Hearts. Defendant testified that she had "a lot" of clients, and she described herself as an "experienced caregiver."

¶ 6    Between February and May 2009, defendant provided services three times to the Browns, who defendant indicated were physically combative and walked around all night shouting. The last time defendant provided services for the Browns, she reported to their home on Thursday, May 14, 2009, at around 5 p.m. Although the Landgraffs met with defendant at that time, they did not discuss with her anything having to do with caring for the Browns.

¶ 7    Katherine testified that, in the Browns' apartment, there was a list on a desk in the kitchen that contained contact information. Katherine indicated that "[e]verything was on there." Katherine theorized that Jensen showed the list to defendant, because "[t]hat was her job" and Jensen was "really thorough." Jensen testified that there was contact information for the family, Joyful Hearts, and BrightStar on a sticker on the Browns' refrigerator, and she believed that she pointed those out to defendant. Defendant testified that she did not know the phone numbers of Katherine or BrightStar.

¶ 8    On May 15, 2009, the Landgraffs left for work early in the morning. While defendant was caring for Eileen, she heard Richard call out to her from the bedroom. Defendant went to the

bedroom and saw that Richard had fallen out of bed and was on the hardwood floor. Defendant tried to help Richard, who was skinny but over six feet tall, stand up. She could not do it. While she was attempting to help Richard, Eileen called out to her. Eileen had soiled herself while sitting on the couch, so defendant left Richard and tended to Eileen. Defendant testified that this took around one hour.

¶ 9    At around 10:30 or 11 a.m., defendant called Jensen, who she knew was away for the weekend. Jensen did not answer the phone, and according to Jensen, defendant did not leave a voicemail. Defendant asserted that she did leave a voicemail for Jensen. Although defendant testified that she tried to call Jensen numerous times, Jensen stated that defendant called her only once. Defendant also tried to contact Roxas, but she, too, was unavailable, and defendant did not leave her a voicemail. Defendant acknowledged that Roxas was far away from the Browns' home.

¶ 10    At 1:30 p.m., Jensen saw that defendant had called her earlier. She called defendant, and defendant told her that Richard was on the floor. Defendant did not tell Jensen how long Richard had been on the floor or if Richard was injured. Defendant told Jensen that she called Roxas and that she tried to get Richard up but could not do so, as she was too little. Jensen testified that she told defendant to call Chris, who would be home soon and could help her. Defendant testified that Jensen told her that she should wait for Chris, and she did not recall Jensen telling her to call Chris. Defendant stated that she checked on Richard a number of times throughout the day and that he was fine.

¶ 11    When Chris returned home at around 3:30 p.m., he received a phone call from defendant. Defendant asked him to come over to the Browns' apartment, but she did not say why. Chris immediately went over to the home, and defendant told him that Richard had fallen. Chris went into the bedroom and saw Richard on the floor. Chris elaborated that Richard was on his hands and knees, with all of his weight on his legs, and that "it was obvious [Richard] couldn't get up on his own." Chris helped Richard get into a chair, Richard told Chris that he was tired, and Chris helped Richard get into bed. In doing so, Chris cleaned up blood from abrasions he noticed on Richard's ankles. Chris testified that defendant tried to help him move Richard, told Chris that she had given Richard cookies and a glass of water, and said that Richard had been on the floor for "[j]ust a little while." Nothing defendant told Chris in her "[l]imited" account of what had happened raised Chris's concerns.

¶ 12    When Katherine returned home from work at about 5:30 or 6 p.m., Chris told her that Richard had fallen out of bed. Katherine went to the Browns' apartment and saw that Richard was in bed. Richard did not tell Katherine anything about falling out of bed. When asked how he felt, he responded that he was tired. Katherine spoke to defendant, and defendant did not describe how Richard fell out of bed or what she did after he fell. Defendant told Katherine that Richard remained on the floor for "[a] little while."

¶ 13    The next morning, May 16, 2009, the Landgraffs went to the Browns' apartment and spoke to Richard. He again said that he was tired. Katherine and Chris changed Richard and noticed that his knees and shins were banged up quite a bit. Katherine phoned Dan, as Katherine and Chris believed that Richard "just wasn't right."

¶ 14    When Dan arrived, he tried to help Richard out of bed. Richard screamed that it hurt, so the family decided to call an ambulance. When the paramedics arrived, Richard could not get out of bed and onto the gurney, as he was in great pain. David Triplett, one of the paramedics,

described Richard's pain as "obvious." He noticed that Richard's legs were bruised and he had abrasions on his arms and legs.

¶ 15 In the emergency room, Dr. Aren Jimenez examined Richard. Jimenez noticed that Richard had a number of bruises on his forearms and abrasions on his knees. After running various tests, Jimenez diagnosed Richard as having rhabdomyolysis, which can result from the release of protein into the blood due to the failure to move one's muscles. Dr. Azra Ali, who also examined Richard, observed that Richard had fresh bruises on his legs, which were consistent with having fallen out of bed. Ali confirmed that Richard was suffering from rhabdomyolysis. Dr. Mitchell Scott King, an expert retained by the State, agreed with the diagnosis and opined that Richard was on the ground for at least 2 hours but more likely 4½ hours. King theorized that Richard's health deteriorated because he was on the floor for so long.

¶ 16 Later in the evening of May 16, 2009, defendant told Chris that Richard had been on the floor for 1 to 1½ hours. Defendant then said that Richard was on the floor for two hours. Defendant later told Katherine that Richard had been on the floor since noon.

¶ 17 Based on this evidence, the jury found defendant guilty, and defendant filed a posttrial motion, arguing that she was not proved guilty beyond a reasonable doubt. The court denied the motion, finding that there was enough evidence for a reasonable jury to find defendant guilty beyond a reasonable doubt. This timely appeal followed.

¶ 18 II. ANALYSIS

¶ 19 On appeal, defendant argues that she was not proved guilty beyond a reasonable doubt of criminal neglect of an elderly person. To prove defendant guilty of that offense as charged here, the State had to establish that (1) defendant knowingly failed to call for assistance when she knew or reasonably should have known that this was necessary to maintain Richard's health and (2) such failure caused Richard's health to suffer. See 720 ILCS 5/12-21(a)(2) (West 2008). However, liability may not be imposed on a defendant "who has made a good[-]faith effort to provide for the health and personal care of an elderly person *** but through no fault of h[er] own has been unable to provide such care." *Id.* § 12-21(d).

¶ 20 When reviewing whether the State presented sufficient evidence to sustain a conviction, we must decide whether, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). A reviewing court will not retry a defendant (*id.* at 279), and it will greatly defer to the credibility determinations of the trier of fact (*People v. Ortiz*, 196 Ill. 2d 236, 259 (2001)). A guilty finding may be supported not only by the evidence but also by any reasonable inferences that may be drawn from the evidence. *Cunningham*, 212 Ill. 2d at 279-80.

¶ 21 Defendant claims that the State failed to establish beyond a reasonable doubt that (1) she knowingly failed to call for assistance when she knew or reasonably should have known that doing so was necessary to maintain Richard's health and (2) she did not make a "good[-]faith effort" to care for Richard. 720 ILCS 5/12-21(a)(2), (d) (West 2008). We consider each contention in turn.

## A. Mental State

We first consider whether defendant knowingly failed to call for assistance when she knew or reasonably should have known that doing so was necessary to maintain Richard's health. *Id.* § 12-21(a)(2). A defendant acts with "knowledge" when she is "consciously aware" that her conduct is "practically certain" to cause the result. *Id.* § 4-5(b). Whether a defendant acted with knowledge is a question of fact. See *People v. Schmalz*, 194 Ill. 2d 75, 81 (2000).

Knowledge is usually proved by circumstantial, rather than direct, evidence. *Ortiz*, 196 Ill. 2d at 260. Thus, knowledge may be established by evidence of the defendant's acts, statements, or conduct, as well as the surrounding circumstances, that supports a reasonable inference that the defendant was consciously aware that the result was practically certain to be caused. See *People v. Fleming*, 2013 IL App (1st) 120386, ¶ 75; *People v. Herr*, 87 Ill. App. 3d 819, 822 (1980).

Knowledge is different from what a defendant "should have known." *People v. Nash*, 282 Ill. App. 3d 982, 986 (1996). " '[S]hould have known' implicates 'the standard of care which a reasonable person would exercise' and therefore pertains to the lesser mental states of 'recklessness' and 'negligence.' " *Id.* (quoting 720 ILCS 5/4-6, 4-7 (West 1992)). A person acts recklessly when she *consciously disregards* a substantial risk that a result will occur. 720 ILCS 5/4-6 (West 2008). A person acts negligently when she *fails to be aware* of a substantial risk that a result will occur. *Id.* § 4-7.

With the above principles in mind, we turn to the facts presented here. Viewed in the light most favorable to the State, the evidence revealed that Richard, an 85-year-old man with many health issues, fell out of bed and onto a hardwood floor. He remained on the floor for approximately 4½ hours. During that time, defendant, who had taken premed courses and who described herself as an "experienced caregiver," made only two phone calls, despite the fact that a detailed list of contact numbers was left in the Browns' home. The two people defendant called were Roxas, her employer, and Jensen, the regular caregiver. Neither answered when defendant called, defendant left no voicemail for either, and defendant acknowledged that neither would have been be able to provide immediate assistance. Several hours after defendant called Jensen, Jensen returned defendant's call. Although Jensen told defendant during that call that Chris would be home soon, she also told defendant to call Chris. Defendant did not promptly call Chris, 911, or anyone else who could help her with Richard. Although defendant fed Richard, gave him water, and checked on him, a rational jury could find that defendant knowingly failed to call for immediate assistance when she knew or reasonably should have known that calling for immediate assistance was necessary to maintain Richard's health.

Defendant argues that the State failed to meet its burden because it did not "show how [defendant] would have known that despite her efforts to care for Richard, his immobility was 'practically certain' to cause a condition that has no physical manifestations and can only be diagnosed through laboratory tests." Defendant's argument assumes too much. As the State notes, the statute does not require that the caregiver know the type of affliction that could manifest itself because of the caregiver's inaction. Rather, the statute requires only that the caregiver act as necessary to maintain the elderly person's health. *Id.* § 12-21(a)(2). Given that defendant attempted to move Richard, continually checked on him, and made two phone calls about what to do, it was reasonable to infer that she knew (or reasonably should have known) that leaving Richard on the floor for several hours would not maintain his health.

¶ 28 Also unavailing is defendant's claim that she cannot be held liable when no one else was concerned enough about Richard to call 911. Only defendant's conduct is at issue here. In any event, defendant gave Jensen, Chris, and Katherine only a "[l]imited" version of what had happened and kept changing her account of how long Richard had remained on the floor, lengthening that time as the weekend went on. A rational jury could have determined that this showed defendant's consciousness of guilt, which supports our holding that defendant was proved guilty beyond a reasonable doubt. See *People v. Seiber*, 76 Ill. App. 3d 9, 13-14 (1979).

¶ 29                                   B. Good-Faith Effort

¶ 30 Defendant also argues that the State failed to prove beyond a reasonable doubt that she did not act in good faith in attempting to care for Richard. The statute provides:

> "Nothing in this Section shall be construed to impose criminal liability on a person who has made a good[-]faith effort to provide for the health and personal care of an elderly person *** but through no fault of h[er] own has been unable to provide such care." 720 ILCS 5/12-21(d) (West 2008).

¶ 31 In construing this provision, we are guided by the well-settled rules of statutory construction. The primary objective in construing a statute is to ascertain and give effect to the legislature's intent. *People v. Martino*, 2012 IL App (2d) 101244, ¶ 25. The surest and most reliable indicator of that intent is the statutory language. *Id.* We must construe the statute as a whole, giving the language its plain and ordinary meaning. *Id.* When the language is clear and unambiguous, we must apply the statute without resorting to any extrinsic aids of construction. *Id.* We review the construction of a statute *de novo*. *People v. Manning*, 2018 IL 122081, ¶ 16.

¶ 32 Two issues arise when construing this provision. First, the statute does not indicate who has the burden of proving the exemption. As defendant notes, "[w]here a criminal statute contains an exemption and the legislature has not set forth a provision within the statute allocating the burden of persuasion as to the exemption, we presume that the burden is on the State, not the defendant." *People v. Cannon*, 2015 IL App (3d) 130672, ¶ 21. Here, the State concedes that it had the burden of proving a lack of good faith.

¶ 33 Second, the statute does not define "good faith," so we may use a dictionary. *People v. Beachem*, 229 Ill. 2d 237, 244-45 (2008); see also *People v. Kucharski*, 2013 IL App (2d) 120270, ¶ 41. "Good faith" means "honesty" (Merriam-Webster's Collegiate Dictionary 502 (10th ed. 2000)) or "a state of mind consisting in *** faithfulness to one's duty or obligation" (Black's Law Dictionary 808 (10th ed. 2014)). Thus, the statute required the State to prove that defendant did not make an honest and faithful effort to provide for Richard's health. Viewing the evidence in the light most favorable to the State, we hold that the State met its burden.

¶ 34 The evidence established that defendant was an "experienced caregiver." After Richard fell onto the floor, she tried to get him up, but she was unable to move him. She then made only two phone calls, to people who she knew could not provide immediate assistance. Hours later, she received a call from Jensen, who told her to call Chris. Defendant did not make that call until Chris returned home, and she told him that Richard had been on the floor for "[j]ust a little while." Although defendant checked on Richard and gave him food and water, the jury could find that this was insufficient to constitute a good-faith effort to care for Richard, an elderly man with many ailments who was stranded on a hardwood floor for several hours.

¶ 35    Defendant argues that the State failed to meet its burden because "she honestly did the best she could under the circumstances." Supporting her position, defendant notes that she, too, was elderly, was much smaller than Richard, and also had to care for Eileen. We believe that such evidence actually strengthens the conclusion that defendant did not act in good faith. That is, given that defendant clearly could not provide Richard with needed care, an honest and faithful effort required her to seek immediate help from someone else.

¶ 36    We also find unpersuasive defendant's contention that the State failed to establish that she acted with "malice." We do not find that an absence of "good faith" requires the presence of malice. Rather, as noted above, it is merely the absence of an honest and faithful effort to provide needed care.

¶ 37                                    III. CONCLUSION

¶ 38    For the reasons stated, we affirm the judgment of the circuit court of Boone County. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 39    Affirmed.