# Illinois Official Reports

## Appellate Court

---

### *People v. Bruemmer*, 2021 IL App (4th) 190877

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RHONDA BRUEMMER, Defendant-Appellant. |
| District & No. | Fourth District<br>No. 4-19-0877 |
| Filed | August 25, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Livingston County, No. 18-CF-141; the Hon. Jennifer H. Bauknecht, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | James E. Chadd, Catherine K. Hart, and Joshua Scanlon, of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Randy Yedinak, State's Attorney, of Pontiac (Patrick Delfino, David J. Robinson, and Linda S. McClain, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE DeARMOND delivered the judgment of the court, with opinion.<br>Justices Holder White and Steigmann concurred in the judgment and opinion. |

¶ 1 In September 2019, a jury found defendant, Rhonda Bruemmer, guilty of criminal abuse or neglect of an elderly person (720 ILCS 5/12-4.4a(b)(1)(B) (West 2016)). In December 2019, the trial court imposed the following sentence: 24 months' probation, 180 days' incarceration in the Livingston County jail with credit for 6 days and 90 days suspended, and undergoing a mental health evaluation and completing any recommended treatment.

¶ 2 On appeal, defendant challenges her conviction on three bases, arguing the State failed to prove her guilty beyond a reasonable doubt, she received ineffective assistance from trial counsel, and the State rendered the trial unfair when it made improper comments during closing arguments. We agree defendant received ineffective assistance of counsel and, therefore, reverse defendant's conviction and the trial court's judgment, remanding for a new trial.

¶ 3                                     I. BACKGROUND

¶ 4 In May 2018, the State charged defendant with criminal abuse or neglect of an elderly person (720 ILCS 5/12-4.4a(b)(1)(B) (West 2016)), a Class 3 felony. The State alleged the following:

> "On or about August and September 2017 *** defendant, a caregiver for Mark Bruemmer, an elderly person, failed to perform acts that she knew or reasonably should have known were necessary to maintain or preserve the health of Mark Bruemmer, and that failure caused Mark Bruemmer's health to be endangered or a preexisting condition to deteriorate ***."

After several delays, the matter proceeded to a jury trial in September 2019.

¶ 5 In its opening statement, the State indicated, "Mark is not able to be here today," explaining the 72-year-old Mark now lived in Arizona and suffered from dementia. Nevertheless, the State indicated the evidence would detail what defendant failed to do when taking care of her father. By contrast, defense counsel's opening statement focused on what defendant did do for her father. Counsel stated defendant "was doing her best to provide care for her father," noting it was defendant who ensured Mark could remain in his home. Defense counsel acknowledged Mark suffered health problems, but he claimed the evidence would show defendant "did her best under the circumstances" and reiterated "she did everything that she could to provide [Mark] with adequate care."

¶ 6 The State called three witnesses and presented photos of Mark's home from August 2017. Renee Bruemmer testified Mark is her father and defendant is her sister. She identified Mark's date of birth as August 20, 1947, making him 70 years old during the alleged abuse or neglect. Renee explained defendant lived with their father. Renee testified she traveled from Arizona, where she lived, to her father's home in Odell, Illinois, in August 2017. She acknowledged she made the trip once defendant phoned her to tell her she believed Mark was dying because he could not walk and was incontinent.

¶ 7 Renee explained she went to Mark's home on August 24, 2017, with two of her brothers and found "[t]he house was disgusting." She testified they found Mark lying in a hospital bed in the living room, which was littered with garbage and dirty adult diapers. She said the carpets were covered "in I don't even know what." Renee testified her father got out of the hospital bed he was lying in and sat in a wheelchair during part of the visit. She stated she and defendant

left to buy food because there was little food in the home. Renee testified defendant asked her to take Mark to his doctor's appointment the next day and Renee agreed to do so.

¶ 8    Renee testified that when she arrived at Mark's home the following day, she found him alone in the living room while an unidentified woman was cleaning cabinets in another room—defendant was not there. Renee observed Mark's diaper was full and "he was covered from like his shirt to his socks in urine." Renee explained Mark's arms were stuck to the bed, so when she tried to pick him up he developed skin tears and started "bleeding everywhere." Renee testified she took Mark to the bathroom, wiped him down, and put clean clothes on him. She called a social worker at the veterans facility to ask what she should do for her father. Renee stated she and her brother, Randy, took their father to the nearby Veterans Affairs Hines Hospital (Hines VA), where he remained hospitalized for 9 or 10 days. She testified her father then went to a rehabilitation center in Aurora, Illinois, until February 2018, when he moved to Arizona to live with her.

¶ 9    The State next called Randy Bruemmer. He testified Mark is his father and defendant and Renee are his sisters. Randy testified defendant had lived with Mark "on and off" over the span of five years. He stated defendant had moved back in with Mark in April or May 2017 and was still living with him in August 2017. Like Renee, Randy testified that defendant called him in August 2017 to tell him Mark was not doing well. He confirmed he went to his father's house with Renee and their brother, Ryan, on August 24, 2017. He described the house as "just a mess *** just stuff thrown everywhere." He said the home smelled like "[a]nimals, feces, urine, [and] smoke." He also described the home as "[j]ust disgusting." He likewise testified "[t]here wasn't much food at all." Randy stated he took pictures of the home to document "just all kinds of stuff all over the place. Clothing, garbage, beer cans, whatever. Anything and everything." He testified he also took photos of the refrigerators to show the lack of food. Through Randy's testimony, the State moved to admit 12 photographs of Mark's home.

¶ 10    On cross-examination, Randy acknowledged he visited Mark only once or twice a year. He testified defendant previously contacted him to inform him that Mark had fallen outside and laid in the yard until someone found him. Randy stated he saw that Mark wore adult diapers during the visit on August 24, but on redirect, he noted Mark also urinated in cups, which were then dumped in the toilet.

¶ 11    The State next called Glyza Vergara, a nurse at Hines VA, who testified she cared for Mark "for a couple of days" while he was hospitalized. She confirmed Mark was admitted to Hines VA on August 25, 2017, and discharged on September 2, 2017. Vergara testified she observed Mark had "a deep tissue injury in his left buttocks and *** coccyx." She explained a deep tissue injury is "a pressure wound *** that you can actually see in a patient if there's a limited mobility." She stated a patient can develop such a wound if confined to a bed. Vergara testified she observed Mark had other ailments, namely "multiple bruises [and] skin tears." On cross-examination, Vergara equated Mark's deep tissue wound to a bedsore and acknowledged even patients receiving proper care in a hospital can develop bedsores.

¶ 12    When the State rested, defense counsel inquired of the court: "At some point can I reserve my motion for directed verdict?" The court answered, "yes," and the case proceeded to the defense's case.

¶ 13    Defendant called two witnesses as part of her defense that she sincerely tried to provide good care to her father. Michelle Billings testified she had known Mark and defendant for 20 years. She considered herself "very close" to Mark, saying: "He's my dad." Michelle testified

she visited Mark and defendant's home daily in August 2017. She said Mark was suffering from health problems at that time and defendant was living with him and providing him care daily. Michelle explained Mark had difficulty walking independently and difficulty talking but defendant helped him, even though it was hard work for her. Specifically, Michelle testified defendant provided Mark with the following: a wheelchair, a hospital bed, a portable toilet, a walker, and rails for the bathtub. Michelle explained multiple people, including herself, helped defendant take care of Mark. She acknowledged Mark could not take care of himself, and she believed he "was doing okay" in defendant's care. Michelle testified she had never met defendant's siblings before August 2017, and she believed defendant was Mark's only child. Michelle also testified she saw people she later learned were defendant's siblings removing Mark's possessions from the home on August 24, 2017.

¶ 14 The defense next called Brigette Folkers, who testified she had known defendant and Mark for 15 years. She stated she was in Mark's home "[m]any times" during August 2017, and she was aware of Mark's health problems. Brigette stated Mark "was well taken care of." She described her last visit with Mark, days before he went to the hospital. She stated he was lying down when she first arrived, but he then got up and sat with her in the kitchen.

¶ 15 Outside the presence of the jury, defendant informed the trial court she decided not to testify, and the defense indicated it intended to rest with no further evidence. The State advised the court of its intent to call a rebuttal witness. Knowing this, the trial court discussed how to proceed, saying that after the rebuttal witness it would instruct the jury, "and when they are deliberating, I'll let you argue your motion for directed finding." Defense counsel replied, "That's fine." The trial court clarified for the record that during "a short side bar *** I did allow [defense counsel] to reserve his motion for directed finding before we proceed."

¶ 16 The State called one rebuttal witness, Randy, who acknowledged he removed some of Mark's possessions from the home, specifically, a tractor, a trailer, and a safe containing Mark's valuables and gun collection. He stated he became Mark's attorney in fact for finances while Mark was hospitalized in Hines VA. He stated he still had Mark's property, except for the trailer, which he sold. He testified he put the funds from the sale into Mark's bank account. This concluded the evidence.

¶ 17 In closing, the State reiterated how Mark lived in "terrible" conditions. The State argued, "[t]he house was terrible" and "had limited food at best." The State noted Mark was left alone in a full diaper that overflowed and covered him with urine. The State recounted Vergara's testimony about Mark's bedsore, skin tears, and bruises. The State took aim at the defense witnesses, arguing their testimony that Mark was well taken care of did not correspond to the evidence of Mark's wounds, his need for hospitalization and then rehabilitation, and the pictures documenting the messy home. The State argued the evidence established defendant's guilt beyond a reasonable doubt. Specifically, the State maintained the witness testimony established defendant lived with Mark as his caregiver and she "knowingly failed to perform acts to preserve the health and safety of Mark."

¶ 18 Defense counsel, on the other hand, argued the State failed to meet its burden of proving defendant guilty beyond a reasonable doubt. Counsel focused on discrediting Renee's and Randy's testimony, positing that if Mark actually lived in terrible conditions, then why did they allow their father to remain in the home for even one more day? Counsel pointed out Renee and Randy left Mark in the home under defendant's care on August 24, 2017, and did not call a doctor, an ambulance, or the police to report the conditions. Counsel also noted the

- 4 -

State's lack of evidence, namely no pictures of Mark's living space and no medical records documenting Mark's specific conditions. Counsel noted there was no evidence that defendant did not attend to Mark's basic needs like medication and food. Counsel conceded Mark needed medical treatment, but he argued that need did not mean defendant had abused or neglected Mark.

¶ 19 Once the jury received their instructions and began deliberations, the trial court recessed without defense counsel arguing his motion for directed finding or bringing it to the court's attention. The jury found defendant guilty.

¶ 20 At the December 2019 hearing, the trial court considered defendant's motion for a new trial and other posttrial relief. Defendant's motion argued she was entitled to either a not guilty verdict or a new trial based on two grounds: (1) the State failed to prove defendant guilty beyond a reasonable doubt and (2) the trial court "erred in not granting [d]efendant's motion for directed verdict and in denying [d]efendant's motion at the close of the State's case in chief." The trial court denied defendant's motion, acknowledging the case "boils down to credibility" and concluding, "[t]here was sufficient evidence if the jury found it credible, which apparently they did based upon their verdict."

¶ 21 The trial court then proceeded to sentencing. Defendant called three witnesses, who each testified defendant was a caring, nonviolent person. These witnesses testified they observed defendant care for Mark and had no concerns about her as a caregiver. Two witnesses testified they believed defendant cared for Mark "to the best of her ability." The State recommended the trial court sentence defendant to three years in the Illinois Department of Corrections. Defense counsel countered with a recommendation of 24 months' probation. In support of his sentencing recommendation, counsel stated:

"I would again very briefly point to the fact as we argued to the jury and as I argued in my motion for new trial while we're not arguing that her father Mark was not having a medical situation and required hospitalization, we are arguing to the Court that, number one, [defendant] was doing everything that she was capable of doing, number one.

And number two, *** you have no testimony, you have no evidence before you that anything that [defendant] did or didn't do caused or exacerbated the condition that [Mark] was suffering from. You have speculation on the part of the State, and that's all you have."

After discussing defendant's education, criminal history, and work history, defense counsel reiterated his request for probation with stayed jail time.

¶ 22 The trial court acknowledged "there's quite a dichotomy between" the evidence presented by the parties. The trial court stated that while "the evidence supports the jury's verdict *** I really think that in this situation [defendant] was in over her head in terms of the care that was necessary for her father." The court discounted Renee's victim impact statement seeking retribution, calling it "selfish" and indicative of family rift. The court opined defendant's siblings abdicated responsibility for their father, meaning Mark's care "was really dumped on [defendant]." In discussing aggravating factors, the trial court noted defendant's criminal history and the fact she was on probation when she committed the instant offense. By way of mitigating factors, the trial court noted defendant did not contemplate her conduct would cause or threaten serious harm. The court reiterated, "I think [defendant] was in over her head more than anything and did not realize how bad the situation was." Similarly, the trial court opined

defendant's conduct was unlikely to recur because "you're not going to be in a situation again I think where you are trying to provide care for somebody and not able to do that because you don't recognize what needs to be done." Finally, the court determined defendant has already received the worst punishment available—loss of her relationship with her father—since the evidence showed those two were always there for each other. The trial court expressed disappointment that defendant's siblings "chose to leave this on [defendant] and then handle the situation the way they handled it." The court went on: "And it seems to me that the brother and sister are more worried about getting [defendant] in trouble than they are about how well their father was being cared for." The court then stated it "reviewed everything and considered everything" and found defendant to be "a low to moderate risk." The court explained it found "the mitigating factors in this case really are more significant than the aggravating factors in this case." It sentenced defendant to a term of 24 months' probation and 180 days in jail, with 90 days' stayed. Given day-for-day credit and credit for time served, the court calculated defendant would need to serve 39 days in the Livingston County jail. The trial court ordered defendant to obtain a mental health assessment and comply with any treatment recommendations.

¶ 23      This appealed followed.

¶ 24                                   II. ANALYSIS

¶ 25      Defendant challenges her convictions on three grounds: (1) the State failed to prove her guilty beyond a reasonable doubt; (2) trial counsel rendered ineffective assistance by failing to move for a directed verdict and then failing to request a jury instruction on the statutory exemption for good faith efforts; and (3) the State made improper comments during closing arguments, appealing to the jury's passions and mischaracterizing the evidence. Because we agree defendant received ineffective assistance and can reverse on that ground alone, we will address only that argument.

¶ 26      But before diving into the ineffective-assistance-of-counsel analysis, we think it necessary to address a threshold issue relating to defendant's offense—criminal abuse or neglect of an elderly person. Specifically, we must determine who bore the burden of raising and proving the statutory exemption.

¶ 27                                   A. The Statute

¶ 28      Section 12-4.4a(b) of the Criminal Code of 2012 outlines criminal abuse or neglect of an elderly person, providing:

> "(1) A caregiver commits criminal abuse or neglect of an elderly person or person with a disability when he or she knowingly does any of the following:
>       ***
>       (B) fails to perform acts that he or she knows or reasonably should know are necessary to maintain or preserve the life or health of the person, and that failure causes the person's life to be endangered, health to be injured, or pre-existing physical or mental condition to deteriorate[.]" 720 ILCS 5/12-4.4a(b)(1)(B) (West 2016).

The statute's next section, section 12-4.4a(c)(2), states when the offense of criminal abuse or neglect of elderly person is *not applicable*, specifying:

- 6 -

"(2) Nothing in this Section imposes criminal liability on a caregiver who made a good faith effort to provide for the health and personal care of an elderly person or person with a disability, but through no fault of his or her own was unable to provide such care." 720 ILCS 5/12-4.4a(c)(2) (West 2016).

While the parties agree section 12-4.4a(c) represents a statutory exemption (or exception) rather than an affirmative defense, they disagree on who bears the burden of proving it—must the State prove section 12-4.4a(c) does not apply (*i.e.*, negate it) or must defendant prove it does apply? Relying upon *People v. Smith*, 71 Ill. 2d 95, 374 N.E.2d 472 (1978), the State argues it never has to negate an exemption and defendant must prove the statutory exemption applies by a preponderance of the evidence. Defendant counters the State must negate the exemption beyond a reasonable doubt, citing *People v. Trajano*, 2018 IL App (2d) 160322, 110 N.E.3d 1133, and *People v. Cannon*, 2015 IL App (3d) 130672, 24 N.E.3d 939. Though we do not find *Smith* directly on point, let alone controlling, we agree with the State that a defendant charged under section 12-4.4a bears the burden of raising and then proving the statutory exemption in section 12-4.4a(c).

¶ 29 The *Smith* court, considering the exemptions in the unlawful use of weapons statute (Ill. Rev. Stat. 1973, ch. 38, ¶¶ 24-1(a)(10), 24-2(g)), observed, "the State need never negate any exemption." *Smith*, 71 Ill. 2d at 105-06. But, unlike the statute here, the exemption in the unlawful use of weapons statute expressly provided: " 'The defendant shall have the burden of proving such an exemption.' " *Smith*, 71 Ill. 2d at 102 (quoting Ill. Rev. Stat. 1973, ch. 38, ¶ 24-2(g)). And the *Smith* court made its statement within a paragraph where it discussed how other statutes in the Criminal Code of 1961 contain similar provisions expressly allocating the burden of proof for exemptions to defendants. *Smith*, 71 Ill. 2d at 105-06 (citing Ill. Rev. Stat. 1975, ch. 38, ¶ 1-1 *et seq.*; Ill. Rev. Stat. 1975, ch. 56½, ¶ 716 (the Cannabis Control Act); Ill. Rev. Stat. 1975, ch. 56½, ¶ 1506 (the Illinois Controlled Substances Act)). Consequently, we read the court's observation that "the State need never negate any exemption" (*Smith*, 71 Ill. 2d at 105-06) as limited to any exemptions in the statutes it identified. *Smith* is further limited here because its holding did not decide who bore the burden of proof for the exemptions but whether it was constitutional for defendants to bear that burden. The *Smith* court ultimately decided the "crucial question before [it]," holding the legislature could place the burden of proof for exemptions on defendants without offending the constitution. *Smith*, 71 Ill. 2d at 106-10. For these reasons, we do not find *Smith*'s statement that "the State need never negate any exemption" (*Smith*, 71 Ill. 2d at 105-06) controlling or even applicable here.

¶ 30 We do, however, find other supreme court precedent applicable to the situation before us. Going back nearly 170 years, our supreme court has instructed, "[e]xceptions are generally mere matters of defense." *People ex rel. Courtney v. Prystalski*, 358 Ill. 198, 204, 192 N.E. 908, 911 (1934) (citing *Sokel v. People*, 212 Ill. 238, 245-46, 72 N.E. 382, 385 (1904), citing *Lequat v. People*, 11 Ill. 330, 331 (1849)). The *Courtney* court explained that when a statute criminalizing an act contains "exceptions *** in the enacting clause creating the offense, so as to be descriptive of it, the People must allege and prove that the defendant is not within the exceptions so as to show that the precise crime has been committed." *Courtney*, 358 Ill. at 203-04. Put differently, if the exception is necessary in defining or describing the offense, then the State must negate the exception, meaning it must prove beyond a reasonable doubt the defendant does not fall within the exception. But when the criminal statute contains an exception that is not "part of the description of the offense, [but] merely withdraws certain acts

or certain persons from the operation of the statute[,] it need not be [negated]." *Courtney*, 358 Ill. at 204. Now, if the State need not negate such exceptions, then it stands to reason defendants must raise and prove them to establish their applicability. This is why the court can say, "[e]xceptions are generally mere matters of defense." *Courtney*, 358 Ill. at 204.

¶ 31 We are unsure why the *Smith* court opted not to cite *Courtney*. To be sure, *Courtney* and its attendant cases could have lent support to *Smith*'s statement that "the State need never negate any exemption." *Smith*, 71 Ill. 2d at 105-06. *Courtney*, nevertheless, remains good law. Indeed, our supreme court has recently cited it approvingly. See *People v. Close*, 238 Ill. 2d 497, 508, 939 N.E.2d 463, 469 (2010) (citing *Courtney* when explaining how to determine if a statutory exception is an element the State must negate or a matter of a defense); *People v. Hackett*, 2012 IL 111781, ¶ 27, 971 N.E.2d 1058 (citing *Courtney* in the discussion of whether an exception was an element of the offense that the State needed to prove); *People v. Tolbert*, 2016 IL 117846, ¶ 14, 49 N.E.3d 389 (citing *Courtney* approvingly when discussing how courts evaluate whether a statutory exception must be negated by the State). We, therefore, find *Courtney*'s line of cases more persuasive than either *Smith* or the cases cited by defendant.

¶ 32 Despite the long-standing supreme court case law stating exceptions are matters of defense, defendant cited two appellate court decisions that said: "Where a criminal statute contains an exemption and the legislature has not set forth a provision within the statute allocating the burden of persuasion as to the exemption, we presume that the burden is on the State, not the defendant." *Cannon*, 2015 IL App (3d) 130672, ¶ 21 (citing *People v. Perkins*, 225 Ill. App. 3d 405, 408, 587 N.E.2d 1271, 1273 (1992)); *Trajano*, 2018 IL App (2d) 160322, ¶ 32. Notably, the *Trajano* court addressed the same statutory exception we face here. There, relying on *Cannon* and a concession from the State, the court determined, "the State *** had the burden of proving a lack of good faith" under section 12-4.4a(c). *Trajano*, 2018 IL App (2d) 160322, ¶ 32.

¶ 33 Given the line of cases culminating in *Courtney*, we think *Cannon*'s and *Trajano*'s presumptions about burdens of proof for statutory exemptions are mistaken. The *Cannon* court relied upon *Perkins*, which, in turn, relied upon the same three statutes cited in *Smith*—the deadly weapons statute (Ill. Rev. Stat. 1989, ch. 38, ¶ 24-2(h)), the Controlled Substances Act (Ill. Rev. Stat. 1989, ch. 56½, ¶ 1506), and the Cannabis Control Act (Ill. Rev. Stat. 1989, ch. 56½, ¶ 716). *Perkins* apparently applied the principle that when the legislature intends for defendants to bear the burden of proving a statutory exemption it expressly says so in the statute. And since the statute at issue in *Perkins* was silent on who bore the burden of proof, while other statutes expressly placed the burden on defendants, the court assumed the legislature did not intend to impose the burden for this particular statutory exemption on defendants. And so, believing it gave effect to what the legislature did not say, the *Perkins* court held: "Here, where the legislature has not provided a provision within the Illinois Vehicle Code allocating the burden of persuasion as to exemptions, we will not presume that such a burden applies to [defendants]." *Perkins*, 225 Ill. App. 3d at 408. There are no indications the *Perkins*, *Cannon*, or *Trajano* courts gave any consideration to *Courtney* or the long line of cases affirming that exemptions are generally matters of defense. Nor did those three cases consider *Courtney*'s instructions to the bench and bar on how to determine who bears the burden of proof for an exemption—descriptive of the offense versus merely withdrawing certain persons or acts from liability.

¶ 34 When reviewing courts construe a statute, it is true we aim to give effect to the legislature's intent; however, we also must presume the legislature knew the common law and, absent an express declaration, did not intend to change the common law. See *People v. Culbreath*, 343 Ill. App. 3d 998, 1011, 798 N.E.2d 1268, 1278 (2003) (stating "the legislature is presumed to be aware of judicial decisions"); *People v. Cole*, 2017 IL 120997, ¶ 30, 104 N.E.3d 325 ("It is well settled that when statutes are enacted after judicial opinions are published, it must be presumed that the legislature acted with knowledge of the prevailing case law."); *Rosenbach v. Six Flags Entertainment Corp.*, 2019 IL 123186, ¶ 31, 129 N.E.3d 1197 ("We must presume that the legislature was aware of that precedent and acted accordingly."). Indeed, we have restated this long-standing principle:

> " 'It is a general rule[,] in the construction of statutes, that they are not to be presumed to alter the common law further than they expressly declare. Statutes are to be construed in reference to the principles of the common law; and it is not to be presumed[ ] that the legislature intends to make any innovation upon the common law further than the case ab[s]olutely requires.' " *People v. Merritt*, 395 Ill. App. 3d 169, 178, 916 N.E.2d 631, 639 (2009) (quoting *Mackin v. Haven*, 187 Ill. 480, 493, 58 N.E. 448, 452 (1900)).

¶ 35 Believing *Perkins*, and therefore *Cannon* and *Trajano*, mistakenly rebuffed these presumptions and, instead, rested on flawed statutory interpretation, we elect not to follow those cases. Nor are we bound to follow them. *People v. Saunders*, 288 Ill. App. 3d 523, 526, 680 N.E.2d 790, 792 (1997) ("We are not bound by the decisions of other districts of the appellate court of this state ***."). We cannot say why the legislature decided against expressly allocating the burden of proof for the statutory good faith exemption in section 12-4.4a(c). Sometimes the General Assembly expressly allocates burdens of proof for exceptions (see 720 ILCS 5/24-2(h) (West 2020); 720 ILCS 570/506 (West 2020); 720 ILCS 550/16 (West 2020)) and sometimes it does not (see 720 ILCS 5/11-1.10(b) (West 2020); 235 ILCS 5/6-20(g) (West 2020); 720 ILCS 5/12-4.4a(c) (West 2020)). We cannot account for the legislature's inconsistency in drafting statutes. Dating back to the nineteenth century, however, the Illinois courts have held that statutory exceptions are matters of defense. So rather than presume silence means the State bears the burden of proving a statutory exception, or trying to discern legislative intent solely from silence, we presume the General Assembly knows the common law and only changes it by express declaration. See *Merritt*, 395 Ill. App. 3d at 178. We, therefore, take the legislature's silence to mean courts must evaluate who shoulders the burden of proof for statutory exemptions using the standard announced in judicial decisions.

¶ 36 Considering the statutory exemption (or exception) before us now, section 12-4.4a(c) of the abuse or criminal neglect of an elderly person statute, "we must determine more generally whether the legislature intended the exception to be 'descriptive' of the offense or whether the legislature intended only to withdraw, or exempt, certain acts or persons from the operation of the statute." *Tolbert*, 2016 IL 117846, ¶ 15 (quoting *Close*, 238 Ill. 2d at 508). As we read it, section 12-4.4a(c) is not descriptive of the offense of criminal abuse or neglect of an elderly person. In other words, the offense can stand alone without the exception, and the two are not comingled. Instead, we understand section 12-4.4a(c)'s good faith exception to merely withdraw or exempt persons like defendant from criminal liability when they make good faith efforts at caring for an elderly person but through no fault of their own they cannot provide adequate care. See *Tolbert*, 2016 IL 117846, ¶¶ 14-15. Having concluded defendant bore the burden of raising and proving the statutory good faith exception in section 12-4.4a(c), we

consider whether defense counsel rendered her ineffective assistance by failing to move for a directed verdict based on the exception and failing to request a jury instruction on the exception.

¶ 37                          B. Ineffective Assistance of Counsel

¶ 38        The Illinois and United States Constitutions guarantee criminal defendants the right to counsel, and the latter mandates, " 'the right to counsel is the right to the effective assistance of counsel.' " *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)); U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. When presented with a defendant's ineffective-assistance-of-counsel claim, we apply the well-established, two-part *Strickland* test wherein the defendant must prove (1) counsel rendered deficient performance and (2) counsel's deficient performance prejudiced the defendant. *People v. Pope*, 2020 IL App (4th) 180773, ¶ 61, 157 N.E.3d 1055; see also *People v. Young*, 341 Ill. App. 3d 379, 383, 792 N.E.2d 468, 472 (2003) (citing *Strickland*, 466 U.S. at 687); *People v. Peck*, 2017 IL App (4th) 160410, ¶ 26, 79 N.E.3d 232. *Strickland* imposes a steep burden for defendants to surmount, requiring defendants to demonstrate both prongs while simultaneously requiring reviewing courts to pay great deference to trial counsel's decisions, meaning we must refrain from hindsight or second-guessing. See *People v. McGath*, 2017 IL App (4th) 150608, ¶ 38, 83 N.E.3d 671 (citing *Strickland*, 466 U.S. at 689).

¶ 39                              1. *Deficient Performance*

¶ 40        To establish deficient performance, "a defendant must show that his counsel's performance fell below an objective standard of reasonableness, as measured by prevailing [professional] norms." *People v. Poole*, 2012 IL App (4th) 101017, ¶ 10, 972 N.E.2d 340. An attorney renders objectively unreasonable performance when he or she commits "errors so serious" whereby the attorney essentially stops functioning as the "counsel" or "advocate" guaranteed to the defendant by the United States and Illinois Constitutions. *People v. Taylor*, 2018 IL App (4th) 140060-B, ¶ 25, 102 N.E.3d 799. Yet, " '[j]udicial scrutiny of counsel's performance must be highly deferential.' " *McGath*, 2017 IL App (4th) 150608, ¶ 38 (quoting *Strickland*, 466 U.S. at 689). Accordingly, when "considering whether counsel's performance was deficient, [we] must indulge a strong presumption that the challenged action, or inaction, was the result of sound trial strategy." *Poole*, 2012 IL App (4th) 101017, ¶ 10.

¶ 41        Defendant identifies two errors her counsel made at trial—failing to move for a directed verdict and failing to request the statutory good faith jury instruction—and argues these errors constitute deficient performance because they were objectively unreasonable *vis-à-vis* prevailing professional norms and not the result of a sound trial strategy. We address each alleged error in turn.

¶ 42                          a. Motion for Directed Verdict

¶ 43        The Code of Criminal Procedure of 1963 allows defense counsel to move for a directed verdict "at the close of the State's evidence or at the close of all of the evidence." 725 ILCS 5/115-4(k) (West 2018). "A motion for a directed verdict asserts only that as a matter of law the evidence is insufficient to support a finding or verdict of guilty." *People v. Withers*, 87 Ill. 2d 224, 230, 429 N.E.2d 853, 856 (1981). The "court is compelled to direct a verdict in favor

of defendant *** if, in viewing all evidence in favor of the State, the evidence overwhelmingly favored defendant such that the jury could not have concluded otherwise." *People v. Rascher*, 223 Ill. App. 3d 847, 854, 585 N.E.2d 1153, 1158 (1992); see also 725 ILCS 5/115-4(k) (West 2018) ("When *** the evidence is insufficient to support a finding or verdict of guilty the court may and on motion of the defendant shall make a finding or direct the jury to return a verdict of not guilty, enter a judgment of acquittal and discharge the defendant.").

¶ 44 It is a well-worn principle that defense counsel need not make futile motions to be considered effective. See *People v. Bradford*, 2019 IL App (4th) 170148, ¶ 14, 123 N.E.3d 1285. And furthermore, the decision "to move for a directed finding [is] clearly [a] matter[ ] of trial strategy" that warrants deference "and [does] not *per se* reflect" deficient performance. *People v. Jennings*, 142 Ill. App. 3d 1014, 1028, 492 N.E.2d 600, 609 (1986). Nevertheless, our strong presumption that defense counsel's decision whether to make a directed-verdict motion "was the product of sound trial strategy may be overcome where no reasonably effective defense attorney, confronted with the circumstances of the defendant's trial, would" make the same decision. *People v. Watson*, 2012 IL App (2d) 091328, ¶ 24, 965 N.E.2d 474.

¶ 45 Here, at the close of the State's case-in-chief, defense counsel asked the court: "At some point can I reserve my motion for directed verdict." The court answered, "Yes." Counsel then called two witnesses, who testified they knew defendant and Mark for a long time and saw them regularly. The witnesses testified that defendant cared for Mark on a daily basis, without any assistance from her family, and she provided for his needs (a hospital bed, walker, portable toilet, handrails, etc.). The defense witnesses also testified Mark did well in defendant's care. At the close of defendant's case, the trial court discussed the next steps with the parties, saying, "I'll read the jury instructions; and when they are deliberating, I'll let you argue your motion for directed finding." To which defense counsel responded, "That's fine." In order to clarify the record, the trial court explained: "And so at one point after the State presented the testimony of Miss Vergara, we had a short side bar; and I did allow [defense counsel] to reserve his motion for directed finding ***."

¶ 46 Curiously, defense counsel did not follow through with his plan for a directed-verdict motion. Though he claimed he did so in his posttrial motion—*i.e.*, arguing for a new trial because the trial court erred in not granting his motion for a directed verdict—defense counsel *never* moved for a directed verdict. We are left to wonder why. Did counsel forget? Did he change his plan? Why, after strategically reserving the right to make a directed-verdict motion until he could present evidence showing defendant met the criteria within the good faith exemption, did defense counsel decide not to ask the trial court to find defendant not guilty as a matter of law and take the decision away from an unpredictable jury? Surely a motion for a directed verdict here would not have been a futile motion since there was some evidence that would place defendant outside the bounds of criminal liability—she "made a good faith effort to provide for the health and personal care of [Mark] ***, but through no fault of *** her own was unable to provide such care." 720 ILCS 5/12-4.4a(c)(2) (West 2016); see *Bradford*, 2019 IL App (4th) 170148, ¶ 14 (stating counsel cannot be ineffective for not filing futile motions and thereby suggesting counsel can be ineffective for failing to file nonfutile motions).

¶ 47 Viewing the record before us, we think defense counsel was setting up the case for disposition on a directed verdict based on the statutory exemption. To be sure, beginning with his opening statement, where three times he said some variation of, "defendant did her best under the circumstances to give Mark adequate care," to the evidence he presented, defense

- 11 -

counsel sought to steer the case toward either a directed finding or not guilty verdict based on the statutory exemption. But even if that was not his strategy, counsel still argued at closing that the State presented insufficient evidence to prove defendant guilty beyond a reasonable doubt. This argument alone would have been appropriate for the motion for a directed verdict he obviously planned to make and the trial court set aside time to hear. Without explanation, counsel did not make the motion. We see no strategic purpose in that.

¶ 48   Although decisions on whether to move for a directed verdict are matters of trial strategy subject to deference (see *Jennings*, 142 Ill. App. 3d at 1028), there is no advantage in forgoing the motion once you have laid the groundwork for it. The defense had nothing to lose by moving for a directed verdict once the jury left to begin deliberations. It is not uncommon for defense counsel to move for a directed verdict both at the close of the State's case-in-chief and again at the close of all the evidence. In fact, it is difficult to envision a circumstance where there is any useful purpose in failing to make these motions. It is even more difficult to envision a useful purpose in waiving the directed-verdict motions here, where the defense presented evidence in support of a statutory exception as part of its case and now wants a judicial determination of its legal sufficiency.

¶ 49   Considering this record, along with prevailing professional norms, while taking caution to avoid second-guessing or hindsight, we conclude defense counsel's decision here was objectively unreasonable, meaning no reasonably effective defense attorney in these circumstances would have decided not to move for a directed verdict after accepting the burden to present evidence of an applicable statutory exception to his client's criminal responsibility. See *Watson*, 2012 IL App (2d) 091328, ¶ 24. Consequently, we find this omission on the part of defense counsel qualifies as deficient performance.

¶ 50   We pause to repeat something we believed self-apparent, that is, motions for directed verdict should be standard practice. As a helpful and potentially dispositive trial tool, a directed-verdict motion should be something defense counsel uses readily. The vagaries of jury trials are such that, once the State has rested, a defendant's motion may from time to time, no matter how infrequently, bear fruit. Counsel loses nothing by making the motion. Once all the evidence is completed, to repeat the motion costs defendant nothing and could, again, provide defendant some relief. Furthermore, we find it necessary to note the potential problems created by failing to address the motion in a timely manner since, from this record, it appears to have somehow been lost in the process. Trial courts risk the problem before us when, after allowing defense counsel to defer his motion for whatever reason, they fail to ensure the motion gets addressed on the record.

¶ 51                    b. Jury Instruction on the Statutory Exemption

¶ 52   "A defendant is entitled to a[ ] [jury] instruction on his theory of the case if there is some foundation for the instruction in the evidence ***." *People v. Jones*, 175 Ill. 2d 126, 131-32, 676 N.E.2d 646, 649 (1997). Defense counsel may tender a proposed jury instruction on its theory of the case, and the trial court should give the instruction, even if "[v]ery slight evidence" supports giving the instruction. *Jones*, 175 Ill. 2d at 132. When deciding whether to give a tendered instruction, " 'the court's role is to determine whether there is some evidence supporting that theory,' " without weighing the evidence. *Jones*, 175 Ill. 2d at 132 (quoting *People v. Jones*, 276 Ill. App. 3d 1006, 1012, 659 N.E.2d 415, 420 (1995) (Cook, P.J., dissenting)).

¶ 53    Generally, counsel's choice of what jury instructions to tender to the court is a matter of trial strategy. *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 97, 58 N.E.3d 1242. "However, the failure to offer an instruction essential to the fair determination of the case by the jury cannot be excused as trial strategy." *People v. Lowry*, 354 Ill. App. 3d 760, 767, 821 N.E.2d 649, 657 (2004). "Accordingly, counsel's decision as to which jury instruction to tender can support a claim of ineffective assistance of counsel only if that choice is objectively unreasonable." *Mister*, 2016 IL App (4th) 130180-B, ¶ 97. Here, defendant argues her counsel's decision not to ask for a jury instruction on the good faith exemption amounted to deficient performance because it was objectively unreasonable. We agree.

¶ 54    The court gave the Illinois Pattern Jury Instructions relating to criminal abuse or neglect of an elderly person. The instructions defined the offense, broke down the offense into two propositions that the jury must find in order to find defendant guilty, and defined statutory terms like "caregiver" and "elderly persons." The committee note for Illinois Pattern Jury Instructions, Criminal, No. 11.75 (4th ed. 2000), which was given, addresses the statutory exceptions, providing: "It will be necessary to give additional instructions if the defendant relies upon either of those exceptions." Defense counsel, however, did not request additional instructions relating to the good faith exception. He informed the jury during opening statements that the evidence would show defendant did the best she could to care for Mark despite difficult circumstances. And indeed, through witness testimony the defense presented evidence that defendant provided good care to Mark even though his condition made it difficult for her to care for him on her own; she alone secured the necessary equipment to care for Mark; she provided for Mark's needs; Mark was doing well just days before the siblings' visit on August 24, 2017; during the visit Mark got out of bed and ate a little food; none of the siblings believed Mark was in danger on August 24, as evidenced by their decision not to do anything for him that day; and defendant believed her sister, Renee, would be taking Mark to his doctor's appointment on August 25, which is why she was not there when Renee arrived.

¶ 55    In our view, the above amounts to at least slight evidence that defendant made a good faith effort to provide for Mark's care but through no fault of her own she was unable to provide such care. We cannot envision a reasonable trial strategy that offers favorable evidence sufficient to allow a specific jury instruction but then omits asking for the instruction which expressly provides that if the jury found the "good faith" exclusion applied, defendant was not criminally responsible under the statute and should be found not guilty. In other words, based on the evidence presented, we think a jury instruction on the good faith exception was necessary to a fair determination in this case. See *Lowry*, 354 Ill. App. 3d at 767. Consequently, it was objectively unreasonable for defense counsel to forgo requesting a good faith instruction. See *Mister*, 2016 IL App (4th) 130180-B, ¶ 97. This amounts to deficient performance. See *People v. Orasco*, 2016 IL App (3d) 120633-B, ¶ 24, 52 N.E.3d 691 (" '[W]here defense counsel argues a theory of defense but then fails to offer an instruction on that theory of defense, the failure cannot be called trial strategy and is evidence of ineffective assistance of counsel.' [Citation.]").

¶ 56                                        2. *Prejudice*

¶ 57    Defendants can satisfy *Strickland*'s prejudice prong by establishing " 'there is a reasonable probability that, but for counsel's [deficient performance], the result of the proceeding would have been different.' " *Mister*, 2016 IL App (4th) 130180-B, ¶ 92 (quoting *Strickland*, 466 U.S.

- 13 -

at 694). Our supreme court defined "[a] reasonable probability [as] a probability sufficient to undermine confidence in the outcome, namely, that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *People v. Enis*, 194 Ill. 2d 361, 376, 743 N.E.2d 1, 11 (2000) (citing *Strickland*, 466 U.S. at 694).

¶ 58                                a. The Directed Verdict Motion

¶ 59    When presented with a motion for a directed verdict, "[a] court is compelled to direct a verdict in favor of defendant *** if, in viewing all evidence in favor of the State, the evidence *overwhelmingly* favored defendant such that the jury could not have concluded otherwise." (Emphasis added.) *Rascher*, 223 Ill. App. 3d at 854. Although we found defense counsel provided deficient performance in not moving for a directed verdict after laying the groundwork for one, we cannot find counsel's performance prejudiced defendant because the evidence did not overwhelmingly favor the defense so as to make a not guilty verdict inevitable. Both sides presented evidence supporting their theory of the case. The State presented witness testimony and photographs suggesting Mark lived in "terrible conditions" and inviting the jury to infer defendant was responsible for those conditions and, in turn, inferring those conditions caused or worsened Mark's physical ailments. The defense presented witness testimony claiming defendant provided Mark with good care despite the difficulties she faced. Defense witnesses testified Mark did well under defendant's care and suggested defendant's siblings were taking advantage of their father's condition by taking his possessions. The trial court suggested the evidence in the case was close when stating the case came down to credibility. While considering defendant's posttrial motion, the trial court commented, "there was sufficient evidence if the jury found it credible, which apparently they did based upon their verdict."

¶ 60    Viewing all the evidence in the State's favor, we cannot say it overwhelmingly favored defendant. See *Rascher*, 223 Ill. App. 3d at 854. In other words, a jury could view this evidence and find defendant guilty—which it did. Consequently, we conclude defendant suffered no prejudice from defense counsel's error of not moving for a directed verdict.

¶ 61                            b. The Good-Faith-Exception Jury Instruction

¶ 62    "A defendant must show prejudice resulting from the failure to tender preferred jury instructions in order to demonstrate a denial of effective assistance of counsel." *People v. Burchette*, 257 Ill. App. 3d 641, 662, 628 N.E.2d 1014, 1029 (1993). This means defendant must demonstrate "a reasonable probability that" had counsel tendered a jury instruction on the good faith exemption, "the result of the trial would have been different." *Enis*, 194 Ill. 2d at 376. A reasonable probability of a different outcome arises when a defendant shows "counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *Enis*, 194 Ill. 2d at 376.

¶ 63    We find instructive to the prejudice inquiry here our supreme court's decision in *People v. Pegram*, 124 Ill. 2d 166, 529 N.E.2d 506 (1988). There, the defendant was charged with armed robbery. The defendant testified two masked men held him at gunpoint and forced him to lead them to an office, where the two men robbed the victim. The defendant testified the two masked robbers forced him to aid in the robbery and then forced him, at gunpoint, into the trunk of the victim's car. The two robbers informed the defendant they knew who he was and could kill him. The defendant testified he did not contact the police because he feared the robbers and he

- 14 -

did not trust the police. *Pegram*, 124 Ill. 2d at 169-70. In his testimony, the defendant "denied arranging the robbery or receiving any of the proceeds from it" and "said he was not a willing participant in the crime and said yes on direct examination when asked, 'at all times during the robbery were you acting under duress and in fear of your life?' " *Pegram*, 124 Ill. 2d at 171. Despite this testimony, defense counsel did not request jury instructions on the affirmative defense of compulsion. *Pegram*, 124 Ill. 2d at 173. In fact, "all the instructions given were those submitted by the State, none of them regarding compulsion." *Pegram*, 124 Ill. 2d at 174.

¶ 64        There, the appellate court reversed the defendant's conviction on two grounds relating to the jury instructions, one being that "[d]efense counsel's failure to object to the given instructions or to offer compulsion instructions" amounted to ineffective assistance of counsel. *People v. Pegram*, 152 Ill. App. 3d 656, 665-66, 504 N.E.2d 958, 966-67 (1987). Our supreme court affirmed the appellate court's holding, observing:

> "On this record it cannot be said that the jury, not having been instructed on the defense of compulsion, knew that the defendant's testimony concerning his fears of immediate harm and being forced by the two masked men to do the described acts could provide a defense to the charge of robbery." *Pegram*, 124 Ill. 2d at 173.

The supreme court went on to note: " 'Fundamental fairness includes, among other things, seeing to it that certain basic instructions, essential to a fair determination of the case by the jury, are given.' " *Pegram*, 124 Ill. 2d at 173 (quoting *People v. Ogunsola*, 87 Ill. 2d 216, 222, 429 N.E.2d 861, 864 (1981)). Though the appellate court reversed on two grounds, the supreme court limited its holding to ineffective assistance of counsel only. The court held "that the failure of the defendant's attorney to tender an instruction on the defense of compulsion *** must be regarded as constituting ineffective assistance of counsel," noting "[t]his critical omission so prejudiced the defense as to deny the right of the accused to a fair trial." *Pegram*, 124 Ill. 2d at 174.

¶ 65        We liken the instant case to *Pegram*. As it did there, the defense here put on evidence that, if found believable, could absolve defendant from criminal liability. Indeed, defendant presented evidence she made good faith efforts to provide for Mark's health and personal care—she cared for him daily even though his conditions made it difficult, and she obtained necessary medical equipment to help; however, probably because she was in over her head, defendant could not provide proper care. The trial court's posttrial comments are reflective of the strength of the defense's good faith evidence. After sitting through the trial and hearing the same testimony the jury heard, the trial court observed Mark's care "was really dumped on [defendant]," and opined: "I really think that in this situation [defendant] was in over her head in terms of the care that was necessary for her father." The trial court likewise described defendant's situation as a one-time circumstance of "trying to provide care for somebody and not able to do that because you don't recognize what needs to be done." The trial court, either unwittingly or otherwise, essentially described defendant's conduct within the "good faith" exemption. The defense's evidence could have satisfied the statutory good faith exemption in section 12-4.4a(c), but the jury never knew about it. The jury did not know that the evidence from defense witnesses that defendant did her best under the circumstances could provide a total defense to the charge of criminal abuse or neglect of an elderly person. See *Pegram*, 124 Ill. 2d at 173. Put another way, the good faith exception would have given the jury another lens through which it could view the above evidence, but the jury did not know it had that lens available. Neglecting to request a jury instruction on the statutory good faith exception limited

- 15 -

the jury's view and understanding of the evidence, which calls into question whether the jury's guilty verdict resulted from " 'a fair determination of the case.' " *Pegram*, 124 Ill. 2d at 173 (quoting *Ogunsola*, 87 Ill. 2d at 222). Accordingly, like the *Pegram* court, we conclude "[t]his critical omission" from defense counsel prejudiced defendant. *Pegram*, 124 Ill. 2d at 174. In our view, the jury not being instructed on an exception that would remove defendant's criminal liability "rendered *** the proceeding fundamentally unfair" and undermines our confidence in the jury's guilty verdict. *Enis*, 194 Ill. 2d at 376.

¶ 66　　　　Having already found defense counsel's failure to request a jury instruction on the statutory good faith exception amounted to deficient performance, and now finding that counsel's deficient performance prejudiced defendant, we conclude defendant received ineffective assistance from counsel. We therefore reverse the trial court's judgment.

¶ 67　　　　　　　　　　　　　　III. CONCLUSION

¶ 68　　　　For the reasons stated, we reverse the trial court's judgment and remand for a new trial.

¶ 69　　　　Reversed.