NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 210198-UB

NO. 4-21-0198

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 25, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Vermilion County |
| ANTHONY POWELL, | ) | No. 20CF221 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Nancy S. Fahey, |
| | ) | Derek J. Girton, |
| | ) | Judges Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Harris and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held:*    (1) The trial court did not err in denying defendant's *Batson* challenge, (2) the improper arguments by the prosecution during closing argument did not amount to reversible error, and (3) the failure to request a certain jury instruction did not result in the ineffective assistance of counsel.

¶ 2    Defendant Anthony Powell appeals his conviction for the offense of possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2020)). Among the issues initially raised in this direct appeal is the denial of defendant's *Batson* challenge (see *Batson v. Kentucky*, 476 U.S. 79 (1986)), the State's alleged misrepresentations of the strength of forensic evidence during closing argument, and the effectiveness of trial counsel.

¶ 3    Following our initial review of defendant's claims, we found that the trial court had failed to conduct an appropriate *Batson* inquiry and remanded for the court to conduct a new *Batson* hearing. *People v. Powell*, 2022 IL App (4th) 210198-U, ¶¶ 22-23. On remand, the trial

court conducted a new *Batson* inquiry and ultimately denied defendant's claim. Having retained jurisdiction, we now review the denial of defendant's *Batson* challenge and the other claims presented. For the reasons that follow, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5        In March 2020, the State charged defendant with two counts of possession of a weapon by a felon (counts I and II) (720 ILCS 5/24-1.1(a) (West 2020)), one count of aggravated unlawful use of a weapon (count III) (*id.* § 24-1.6(a)(1), (a)(3)(A)), and one count of resisting a peace officer (count IV) (*id.* § 31-1(a)). The charges alleged generally that defendant, a felon, possessed a loaded handgun and ran from the police, refusing to comply with commands to stop. Count I additionally alleged that defendant was on parole at the time of the offense.

¶ 6                                    A. *Voir Dire*

¶ 7        During questioning of prospective jurors, the trial court asked if any of the venire members possessed a valid reason they could not serve on the jury for a trial expected to last a day and a half. Prospective juror Stingley responded, stating, "I am a nurse in the middle of a pandemic. We had 20 positive [COVID-19] cases, we have seven employees [that] tested positive that are out, so they are really short staffed at my facility." The court asked Stingley what facility she worked at and what shift she worked but then moved on.

¶ 8        The State then questioned Stingley, and the following colloquy ensued:

"MR. PAWL [(ASSISTANT STATE'S ATTORNEY)]: Nurse Stingley, I take it—you raised your hand right away. Your shift right now, would you be on shift right now?

PROSPECTIVE JUROR STINGLEY: Yeah.

MR. PAWL: Is it causing you some concern?

PROSPECTIVE JUROR STINGLEY: Not a big concern, but I just know that, like, I'm needed. It's like—like I said, it's a pandemic and staff is low, but—

MR. PAWL: That's what we want to get at. If something is in the back of your mind because I think if you were not here or if you got excused you would go—you would be going—

PROSPECTIVE JUROR STINGLEY: I would go right back to work.

MR. PAWL: Is that something that might be in your mind as you are going forward, knowing you would have to be here today and tomorrow?

PROSPECTIVE JUROR STINGLEY: I mean like, no, it wouldn't play, like, a role. I would be able to focus and concentrate if I wasn't dismissed.

\* \* \*

MR. PAWL: But in your mind are you needed?

PROSPECTIVE JUROR STINGLEY: I feel like, yeah, I'm needed. Yeah."

¶ 9 Another panel of prospective jurors was brought in. In response to a question from the trial court, prospective juror Groves stated he had a drug conviction from a federal case that resulted in a sentence of 60 months in federal prison. The State asked Groves whether he harbored any ill will or ill feelings towards prosecutors as a result of his criminal history. Groves responded, "No."

¶ 10     Jury selection progressed, with the State asking the court to remove Stingley for cause. The court denied this request, noting Stingley stated she could perform her duty as a juror. The State made clear that the reason it attempted to remove Stingley for cause was not based on the *voir dire* questioning; rather, it believed "her services would be better off, especially right now, at the hospital than here." The State then exercised peremptory strikes on prospective jurors Griggs, Grider, Stingley, and Groves. Following the State's strike of Groves, defense counsel asked, "[I]s there a reason that we're losing all the African-American members in this panel?" referring to Stingley and Groves. The court replied that the record was clear as to the State's reasoning for excusing Stingley "because of her occupation as a nurse and the COVID *** pandemic and the concern she raised about that. I don't know, are you raising a *Batson*?" Defense counsel answered in the affirmative, adding that being employed as a nurse was an insufficient basis for being excused. The following exchange then took place:

"MR. PAWL: Judge, if he is accusing the People of—he has to establish before we collapse into any kind of hearing some type of systematic pattern and the burden is on him.

THE COURT: Right.

* * *

THE COURT: What's the systematic pattern, Mr. Parker?

MR. PARKER [(DEFENSE COUNSEL)]: Well other than the ones that were stricken for cause, and I understand why they were stricken for cause, that leaves two, both stricken. And, you know, systematic, listen, you know, there is only two, Judge, and one of them—I don't know why we would strike the nurse. Because she has an obligation, because she works in

- 4 -

a hospital? And then Mr. Groves. They are the only two that were left. \*\*\* but here we are, we are going through another panel because the only two African-Americans left when I have an African-American client, they are both stricken."

¶ 11    The State responded that its first two peremptory challenges were on two white individuals. With respect to Stingley, the State commented that it was unsure of her race, asserting, "In fact, as I sit here, I didn't know if she was maybe of Indian descent, quite frankly." In sum, the State argued that defense counsel failed to establish a systemic pattern of discrimination.

¶ 12    The trial court found that defense counsel failed to establish a "pattern of systematic removal of black people from the jury." Regarding Stingley, the court found that the State had established a race-neutral reason for excusing her, given the unique circumstances of being a nurse in the middle of a pandemic. The court found that counsel failed to establish "any pattern" regarding Groves.

¶ 13                                B. Jury Trial

¶ 14    In November 2020, the trial court conducted a jury trial, at which the State proceeded only on count I. The parties stipulated that defendant was (1) a felon and (2) on parole at the time of his arrest. The following evidence was presented.

¶ 15                         1. *The State's Evidence*

¶ 16    On March 28, 2020, shortly after midnight, Officers Ryan Birge and Jacob Troglia of the Danville Police Department were on a routine patrol in a marked squad car in the Fair Oaks public housing complex in Danville, Illinois, when they observed a man in a red hooded sweatshirt and black pants walking toward an apartment door and away from a car that was stopped in the middle of the roadway. The car was running with its headlights on. Birge and Troglia were 50 to

60 feet away when they first saw the man. The area was dark, but the man was illuminated by a streetlight. When the man saw the police officers, he immediately started jerking a door handle, trying to get into an apartment.

¶ 17    The officers drove their car to within 15 feet of the man, and Birge asked him through the car's open window, "Hey, man, do you live here?" The man, who at that moment was knocking on an apartment door, looked back in the direction of the officers. On cross-examination, Birge acknowledged that his asking whether the man lived at the apartment did not appear in his police report. According to Birge, before he could finish the question, the man ran, so Birge got out of the car and ran after him. Troglia also got out and chased the man on a different path and noticed that he had a "dark colored object in his right hand." Birge estimated that "30 seconds maybe" passed between the time the officers first saw the man until he was pursued.

¶ 18    During the chase, Birge saw the man "pull out a handgun" and continue to run with it in his right hand. Seeing this, Birge unholstered his firearm and slowed his pursuit. As Birge rounded a corner, he saw the man glance back at him and then "just kind of throw the gun straight up in the air." The gun hit the ground with "a loud crack." Because people were in the area, instead of continuing his pursuit of the man, Birge stopped to secure the weapon. He found the gun lying in some wet grass but noted the gun was still dry. At some point during the chase, the man had removed the red sweatshirt, which was later recovered by the officers. The chase lasted approximately one minute.

¶ 19    During the pursuit, Troglia reported the chase with his radio, stating, "Red sweatshirt, black pants, about six foot tall." Within a few minutes, Troglia caught up with Birge, who told him that the suspect had thrown the gun that was on the ground next to him. Troglia then circled back to the squad car while Birge stayed with the gun until it could be photographed and

placed in an evidence bag. The gun was admitted as evidence at trial. When Troglia returned to the vehicle, he contacted dispatch "to log the license plate so that they have a record of what vehicle was involved." Dispatch alerted him that the vehicle was registered to defendant and confirmed that defendant's license was suspended. Defendant's vehicle was later towed and impounded.

¶ 20 Although Birge and Troglia did not apprehend the man after the chase, Birge testified that he recognized the man based on prior encounters but could not remember his name. Birge had arrested defendant in October 2019, when he was wearing what Birge believed to be the same red sweatshirt that was subsequently collected from the scene of the incident at issue. Troglia testified that he recognized the man as defendant even though the hood on the hooded sweatshirt was up, because when "he turned around and looked at us and you could see his face under the streetlight." Troglia was familiar with defendant from encounters in the months preceding the incident at issue and knew that he had a suspended driver's license.

¶ 21 When Birge returned to his squad car, Troglia told him that he ran a check of the license plates and determined that defendant was the registered owner of the car. Surveillance video obtained from the Danville Housing Authority showed that after the officers' pursuit of the suspect, but before they returned to the car, an unidentified individual got inside defendant's vehicle, exited, and then walked away toward one of the apartments.

¶ 22 On March 30, 2020, defendant visited the police station to obtain his car from the impound lot, at which point he was arrested by Troglia. Defendant told Troglia that he did not know who was using his car when it was towed. When Troglia asked defendant about the red sweatshirt he always wore, defendant said he never owned one.

¶ 23 Svetlana Gershburg, a forensic scientist employed by the Illinois State Police Forensic Crime Laboratory, performed deoxyribonucleic acid (DNA) analysis of samples from the

sweatshirt and gun and compared them to defendant's known DNA profile. On the sample from the gun, Gershberg identified three separate DNA profiles. She was able to identify one of those three as a "major DNA profile" from which defendant could not be excluded as a contributor. The prosecutor asked Gershburg whether she conducted a statistical analysis, and Gershburg answered, "the major profile *** can be seen independently in other people, with one in every five people."

¶ 24 On the sweatshirt, Gershburg identified a major male DNA profile from which defendant could not be excluded by a statistical probability of 1 in 45 quadrillion.

¶ 25 Brian Long, a forensic scientist specializing in latent print analysis, examined the gun and found no fingerprints suitable for comparison.

¶ 26 2. *Defendant's Testimony*

¶ 27 Defendant testified that he had loaned his car to his friend Anthony Brown on the night of the offense. Brown lived at an apartment in the Fair Oaks housing complex. Defendant had lent his car to Brown on five or six prior occasions. On the evening of March 27, 2020, defendant drove to Brown's apartment, picked up Brown and Brown's cousin, and the three drove to Alexis King's house. That evening, Brown wore a "[b]lack T-shirt and some dark pants," and defendant wore "a red T-shirt, blue jean pants, and some red and black [shoes]." When defendant arrived at King's, he "went in and dozed off," waking up the following morning. During that time, defendant opined that Brown and his cousin took defendant's vehicle. When defendant woke up, he thought that he had left his phone in his car the night before. He contacted Brown to retrieve it and, at that time, he learned that his car had been towed.

¶ 28 That afternoon, defendant called the police station to see if he could pick up his car, but he was not able to do so because the officers said he would have to speak to them in person. On March 30, 2020, defendant, who was wearing a black shirt and black pants, went to the police

station to pick up his car and was arrested by Troglia. Defendant denied that he told Troglia he was unaware of who had his car. Defendant also denied telling Troglia he did not own a red sweatshirt.

¶ 29 At trial, defendant testified that he was about the same physical size as Brown and the two shared clothes "frequently." Unlike defendant, who had tattoos on his arms, face, and neck, Brown did not have tattoos in those locations. Defendant owned a few red sweatshirts and black T-shirts, and he frequently kept clothing in his car.

¶ 30 C. Closing Arguments

¶ 31 1. *The State's Closing Argument*

¶ 32 During closing arguments, the State argued, among other things, that the DNA evidence and the police officers' testimony proved beyond a reasonable doubt that defendant was the man with the gun in March 2020. Throughout its argument, the State made several statements regarding the strength of the DNA evidence found on the gun. The State began its argument by stating, "[In March 2020,] an individual driving his [(defendant's)] car, wearing his red sweatshirt, ran from two Danville police officers carrying a gun which had his DNA, the defendant's[,] on it." The State also argued that the police officers "submitted [the gun] to the lab to be tested, they took swabs from the defendant and confirmed that his DNA was on the gun."

¶ 33 2. *Defendant's Closing Argument*

¶ 34 Defendant argued that the police officers' testimony was not credible because it was inconsistent with the police report, video, and dispatch audio. He further argued that the suspect with the gun could have been Brown. Regarding the DNA evidence on the gun, defendant stated the following:

"There's three different people's DNA on [the gun]. Again, his is the only DNA

they ran. He cannot be excluded as one of the three. But it transfers, it can transfer from—from sweatshirt to gun no matter who is wearing that sweatshirt, and it's 1 in 5 people's DNA, okay? This DNA is so general, 1 in 5 men's DNA, that's 20 percent. There's 15 men in this courtroom right now. Three of us, it could be ours, it could be—they're included. The state's attorney. Three of you are included. Me, I'm included. It could be me. That's how common that DNA was."

¶ 35                              3. *The State's Rebuttal*

¶ 36          During rebuttal, the State described the DNA evidence multiple times as strongly corroborating the police officers' testimonies. Regarding the DNA on the gun, the State argued as follows:

"Two police officers identified this defendant, the forensic scientist identified this defendant through the DNA on his sweatshirt and the DNA that he left on that gun.

* * *

Then the defense did talk about this—did talk about the DNA. You heard the numbers. It's the defendant's on the sweatshirt because he was wearing it. *** We submitted the defendant's [DNA] because—and it corroborated everything we already knew, that it was the defendant who ran from the police.

Now, the 1 in 5 that he talks about, he goes, well, there is 15 males here, that means one of us—there is only one person in this courtroom that was out at Fair Oaks that night with that gun and it's him, the defendant, and that's what the science establishes and corroborates the two officers.

* * *

So again, it comes down to this, folks. This case is simple. Two police

officers, forensic science, establish without any doubt that this defendant is the one who ran from the police and tossed that gun."

¶ 37                    D. Jury Verdict and Initial Review of Appeal

¶ 38         Following deliberations, the jury found defendant guilty of unlawful possession of a firearm by a felon on parole. The trial court later sentenced defendant to 10 years in prison, and defendant appealed. Upon our initial review of defendant's arguments on appeal, we determined that the trial court improperly collapsed the three-step *Batson* inquiry and remanded for an appropriate *Batson* hearing. *Powell*, 2022 IL App (4th) 210198-U, ¶ 23. This court withheld the disposition of defendant's other arguments on appeal and conditionally retained jurisdiction.

¶ 39                    E. Remand for New *Batson* Hearing

¶ 40         On June 28, 2023, a new *Batson* hearing was held, with Judge Derek Girton presiding following the retirement of Judge Nancy Fahey. Defense counsel argued that after considering the nonexhaustive list of factors to be considered at the first stage of a *Batson* hearing, there was sufficient evidence to infer that discrimination based on race formed the basis for striking both Groves and Stingley. The trial court agreed and found sufficient evidence to infer that discrimination based on race formed the basis of the prosecutor's strikes of the prospective jurors, shifting the burden to the State to provide a neutral or nondiscriminatory explanation for the removal of the prospective jurors.

¶ 41         The State directed the trial court's attention to the prior proceedings, explaining Stingley was removed because she was employed as a nurse during the COVID-19 pandemic and "that her time would be better spent at the hospitals as opposed to here on a jury." Race was not a factor, and the prosecutor exercising the peremptory strike "could not make an independent recollection of what skin color she was." As to prospective juror Groves, the State argued he was

- 11 -

a convicted felon that served time in federal prison. In sum, there was no pattern of discriminatory strikes and each prospective juror that was stricken was removed for a nondiscriminatory reason.

¶ 42 Defense counsel argued in rebuttal that the State's race-neutral reasons for removing prospective jurors Stingley and Groves was pretextual. Counsel contended Stingley's employment was not a "legitimate reason" under *Batson* and faulted the State for trying "to elicit hesitation multiple times with repeated questions" that encouraged Stingley to suggest that her employment would leave her unable to focus if selected to serve on the jury. Counsel also introduced into evidence a black and white picture of Stingley in her nursing uniform, arguing the photograph depicted "an African American woman."

¶ 43 As to the ultimate question of whether the State engaged in impermissible intentional discrimination in striking prospective jurors Groves and Stingley, the trial court found there were race-neutral reasons proffered by the State that were not merely pretextual. The court reasoned that as to Groves,

> "it is certainly not unusual in my experience for the State to use a [peremptory] challenge on an individual white or black who had been convicted of a felony for which they have done either [Department of Corrections] time or Federal prison time. In fact, that is a pretty common practice by a prosecutor." *** That is a race[-]neutral explanation and one that is not at all unusual ***."

And regarding Stingley,

> "at the time of this trial in November of 2020, we were about six or seven months into this pandemic, it was still relatively new but it was certainly at this point in this County raging. I think—it amazes me, at least for myself, how easily you can forget something like that, how serious it—something like that was at that moment and

- 12 -

two or three years later you don't remember it as being what it was at that time. We literally shut down jury trials in this courthouse for a long period of time. [Defendant's jury trial] must have been one of the last ones that was done before because of COVID we just shut it down completely. It was a scary time for people wanting to know how we deal with this. Ms. Stingley worked in a nursing home with the most vulnerable of populations. She reported that there was an outbreak within the institution where she worked, a lot of cases among the patients, I think she said there were 20 or something, she stated a number, and that she knew of at least 7 individuals that worked there that were out with COVID, and so that there was an employment shortage. Clearly from the questioning from the beginning this was something that concerned Mr. Pawl that she was really needed somewhere else. He asked based on that she be removed for cause. I'm not second guessing Judge Fahey on her decision on that, but, again, we're looking at the intentions of the prosecutor in his removal of Ms. Stingley. It I think is clear to me that throughout his questioning of her and the *voir dire* process he was concerned that she really needed to be at work and not here. That was where she could better serve our community."

Defendant's *Batson* challenge was denied.

¶ 44      Following the denial of defendant's *Batson* challenge, the parties have filed supplemental briefing arguing the propriety of the trial court's ultimate decision following the *Batson* hearing. We now proceed to address those arguments, along with the others pending on appeal.

¶ 45                         II. ANALYSIS

¶ 46    Defendant argues that (1) the trial court erred in finding there were race-neutral reasons proffered by the State that were not merely pretextual, (2) defendant was deprived of his right to a fair trial when the State misrepresented the strength of DNA evidence during its closing argument and rebuttal, and (3) defendant's trial counsel rendered ineffective assistance by failing to object to the State's improper statements during closing and rebuttal arguments and tender certain jury instructions to the court.

¶ 47                    A. *Batson* Challenge

¶ 48    The United States Supreme Court in *Batson* found that it was a violation of the fourteenth amendment's equal protection clause (U.S. Const., amend. XIV, § 1) to exercise peremptory challenges based on the race of a prospective juror. *Batson*, 476 U.S. at 89. The Court crafted a three-step process for evaluating whether the use of a peremptory challenge resulted in removal of venirepersons on the basis of race. *People v. Davis*, 231 Ill. 2d 349, 360 (2008).

¶ 49    In the first step, the moving party opposing the peremptory strike must present sufficient evidence to permit the trial court to infer that discrimination based on race formed the basis for striking the prospective juror. *People v. Allen*, 401 Ill. App. 3d 840, 847-48 (2010). The court must determine whether the moving party has established a *prima facie* case of racial discrimination by considering the totality of the facts and circumstances surrounding the use of the peremptory strike. *People v. Shaw*, 2014 IL App (4th) 121157, ¶ 18.

¶ 50    If the moving party is able to carry the burden in the first step, in the second step, the nonmoving party must provide "a nondiscriminatory, 'neutral' explanation related to the particular case to be tried," which can then be rebutted as pretextual. *People v. Rivera*, 221 Ill. 2d 481, 500 (2006), *as modified upon denial of reh'g* (June 29, 2006).

¶ 51    Finally, the trial court must determine whether the defendant has shown intentional

discrimination based on the evidence presented. *Davis*, 231 Ill. 2d. at 363. If the trial court rules on the ultimate issue of intentional discrimination after the nonmoving party explains the basis for the peremptory challenge in the second step, a court's failure to determine whether a *prima facie* case has been established in the first step is rendered moot. See *People v. Kitchen*, 159 Ill. 2d 1, 18 (1994); *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 67; *People v. Payne*, 2015 IL App (2d) 120856, ¶ 47. The burden of persuasion remains with the moving party throughout the process to show the nonmoving party's racial motivation in exercising the strike. *Davis*, 231 Ill. 2d. at 363.

¶ 52        Before evaluating the trial court's ultimate finding, we must address two issues raised by the parties. First, the trial court's ultimate ruling on a *Batson* challenge is generally entitled to deference on appeal and will not be reversed unless it is clearly erroneous. *Id.* at 364. However, defendant argues that, in this case, review of the issue should be *de novo* because the presiding judge and prosecutor on remand were not involved in the original *voir dire* proceedings, citing *Holder v. Welborn*, 60 F.3d 383, 388 (7th Cir. 1995). The State agrees with defendant that *de novo* review of this issue is appropriate given the circumstances. Here, the explanation for the use of the peremptory challenge and the ruling of the court on remand did not significantly deviate from the those in the original *Batson* hearing. Following our review of the issue, we find that the outcome of defendant's challenge would be the same regardless of the standard of review employed.

¶ 53        Second, the State points out that defendant at certain points in his supplemental brief relies on evidence that was not presented to the court below. As a result, any consideration of this evidence is improper, and this court should disregard it. Specifically, the State points to the discussion of the difference between licensed practical nurses and registered nurses, as well as the general duties of a hospital sterile processing department. We agree with the State that

consideration of this evidence is improper where it was not made a part of the record below; we will therefore not consider it. See *People v. Brown*, 249 Ill. App. 3d 986, 994 (1993) (noting a reviewing court will not consider matters outside the record); accord *People v. Carey*, 386 Ill. App. 3d 254, 270 (2008).

¶ 54 Turning to the merits, defendant's *Batson* argument turns on whether the reason given by the State for excusing Stingley was pretextual and whether the trial court erred in determining that the reason was race neutral. We are unable to conclude that the court erred in its ultimate conclusion.

¶ 55 At the beginning of *voir dire*, Stingley voluntarily informed the trial court that, due to her employment as a nurse in a nursing home experiencing an outbreak during the COVID-19 pandemic and a shortage of staff at that facility, she had a valid reason not to serve on the jury. During the original proceedings, it was determined that, when the State attempted to remove Stingley for cause, it was due to the belief that her services would be better utilized at her understaffed facility amidst the pandemic. When denying the *Batson* challenge prior to remand, the trial court found that the State had established a race-neutral reason for excusing Stingley given her role as a nurse during the pandemic.

¶ 56 On remand, the explanation of the State and reasoning of the trial court largely remained unchanged. The court placed the prosecutor's use of the peremptory challenge in its historical context, opining on the novelty of the pandemic at the time, how it was "raging" in the community, and how the contagion resulted in the cessation of jury trials and closure of the county courthouse. Further commenting on the situation, the court stated, "It was a scary time for people wanting to know how we deal with this." Placing the removal of Stingley in context, the court found that she worked with "the most vulnerable of populations" at a facility dealing with an

outbreak of COVID-19 and a staffing shortage. The court ultimately found it was clear that throughout the prosecutor's questioning of Stingley, "he was concerned that she really needed to be at work and not here. That was where she could better serve our community."

¶ 57    Defendant argues that "it is essential to remember the underlying circumstances presented by this case," stating that the only two black jurors were removed by peremptory challenges. Although the parties argue over whether Stingley was readily identifiable as black, we find that even assuming that fact, the trial court found Groves was removed for a "pretty common" race-neutral explanation where he had been convicted of a felony and served his sentence in federal prison, and Stingley was employed as a nurse during the pandemic. However, while focusing on certain circumstances, defendant attempts to minimize the impact of the pandemic and Stingley's employment as a nurse. Despite this, we agree with the trial court that the pandemic taking place at the time of *voir dire* is a circumstance that deserves proper consideration given its enormous impact on individuals and the court system.

¶ 58    Defendant also argues that the prosecution failed to question a similarly situated white prospective juror that worked as a sterile processing technician at a hospital. However, aside from working in the field of healthcare, the other juror was not similarly situated and did not express that she worked at an understaffed facility, caring for one of the most vulnerable portions of the population to the disease, nor that the hospital was experiencing an outbreak of COVID-19. These two jurors were not similarly situated.

¶ 59    Moreover, defendant argues there was no trial-related justification for Stingley's removal from the venire and points to questioning during *voir dire* as evidence of discriminatory intent. These arguments ignore the fact that Stingley is the one that voluntarily claimed she had a valid reason not to be seated on the venire. In support of this argument, defendant cites *Flowers v.*

*Mississippi*, 588 U.S. ___, 139 S. Ct. 2228 (2019), *Jackson v. Stroud*, 539 S.W.3d 502 (Tex. Ct. App. 2017), and *Snyder v. Louisiana*, 552 U.S. 472, 482 (2008). A review of these cases shows that they are distinguishable from the present case.

¶ 60      *Flowers* described its facts as "highly unusual" and "likely one of a kind" where the defendant stood trial six times, resulting in just as many reversals of his conviction, and the Court in finding discriminatory intent relied on statistical evidence showing a historical pattern of excluding jurors based on race where the prosecution used peremptory strikes to remove 41 of the 42 prospective black jurors in the defendant's trials. *Flowers*, 588 U.S. at ___, 139 S. Ct. at 2241, 2251. In light of the totality of the facts and circumstances, the Court determined that the trial court erred in concluding that the use of a peremptory strike to remove a prospective black juror was not substantially motivated by discriminatory intent. *Id*. at ___, 139 S. Ct. at 2246. This case is unlike *Flowers*.

¶ 61      In *Jackson*, a black prospective juror was removed by a peremptory strike in a medical malpractice case, and when a *Batson* claim was made, counsel exercising the peremptory removal only asserted that the prospective juror was removed because she was a "certified nursing assistant." *Jackson*, 539 S.W.3d at 509. On review, the court found that reason was pretextual, explaining that counsel failed to further investigate his concerns during *voir dire* and a comparative juror analysis revealed that similarly situated nonblack panelists were not stricken or even questioned. *Id.* at 511. Here, the prosecutor engaged in further questioning during *voir dire* and the prosecution did not engage in disparate treatment of similarly situated prospective jurors.

¶ 62      In *Snyder*, the Supreme Court held that the trial court erred by overruling the defendant's *Batson* challenge to the removal of a black prospective juror. *Snyder*, 552 U.S. at 477-78. The prosecutor explained the peremptory strike was based on the prospective juror's demeanor

and that he was a student teacher, resulting in a fear that the prospective juror "might, to go home quickly, come back with guilty of a lesser verdict so there wouldn't be a penalty phase." *Id.* at 478. The Court found this reasoning "highly speculative," "implausible," and further undermined by the acceptance of white jurors with "conflicting obligations that appear to have been at least as serious" *Id.* at 483. Unlike *Snyder*, the prosecutor's reasoning in this case was neither highly speculative nor implausible, and no other jurors with similar conflicting obligations were seated on the jury.

¶ 63        Accordingly, based on the totality of the facts and circumstances, we find that the trial court did not err in denying defendant's *Batson* challenge to the peremptory strike of the prospective juror.

¶ 64                                B. Closing Argument

¶ 65        Next, we address defendant's argument that he was deprived of his right to a fair trial when the State misrepresented the strength of the DNA evidence during its closing argument and rebuttal. Initially, defendant concedes that he forfeited this issue by failing to raise it at trial but contends that we can review his claim pursuant to familiar exceptions to forfeiture: plain error and ineffective assistance of counsel. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (finding that to preserve an issue for review, a party must raise the issue at trial and in a written posttrial motion).

¶ 66                                1. *Plain Error*

¶ 67        "Plain error may be demonstrated in one of two ways. To establish first-prong plain error, defendant must show that the evidence was closely balanced and that the prosecutor's comments were 'clear or obvious' reversible error that changed the outcome of the trial." *People v. Mudd*, 2022 IL 126830, ¶ 22. To establish second-prong plain error, "defendant must prove that

the alleged error was serious enough to affect the fairness of the trial or to undermine the integrity of the judicial process." *Id.* "The initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error at trial." *People v. Sebby*, 2017 IL 119445, ¶ 49. Accordingly, we first consider whether the State's closing and rebuttal arguments constitute error. Defendant "bears the burden of persuasion under both prongs of the plain error doctrine." *People v. Reese*, 2017 IL 120011, ¶ 69. If he fails to meet his burden, we will honor his procedural default. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). We review claims of plain error *de novo*. *Mudd*, 2022 IL 126830, ¶ 22.

¶ 68 Defendant alleges that the State erred by misstating the strength of the DNA evidence related to the gun in its closing and rebuttal arguments. Specifically, defendant contends that the State "repeatedly mischaracterized the DNA evidence as conclusively showing that [defendant] was in possession of the gun." To the contrary, defendant asserts the DNA evidence did not demonstrate anywhere near a certain match for defendant's profile.

¶ 69 "A prosecutor has wide latitude in making a closing argument and is permitted to comment on the evidence and any fair, reasonable inferences it yields." *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). While prosecutors have wide latitude in closing arguments, "there are limits to proper argument." *People v. Simms*, 168 Ill. 2d 176, 196 (1995). Regardless of the procedural posture of defendant's improper closing argument challenge, a reviewing court will reverse a judgment only if the prosecutor's comment was "damaging enough that it severely threatened to tip the scales of justice against the defendant." (Internal quotation marks omitted.) *People v. Williams*, 2022 IL 126918, ¶ 57.

¶ 70 At trial, Gershburg testified that "[defendant] could not be excluded from people who potentially contributed to" DNA taken from the gun. She clarified that the major DNA profile

"can be seen independently in other people, with one in every five people." This is relevant and probative evidence, as it showed that defendant's DNA was consistent with that left on the gun, though it was not specific to defendant. However, the prosecutor severely overstated the significance of the DNA evidence, going so far as to state that the gun "had [defendant's] DNA, the defendant's DNA on it" and the forensic testing "confirmed that his DNA was on the gun." It can be "highly persuasive" to jurors to suggest that a defendant is "a DNA match" to a relevant sample. *People v. Wright*, 2012 IL App (1st) 073106, ¶ 96. Because the prosecutor's statement that testing "confirmed" that defendant's "DNA was on the gun" was not supported by the evidence or reasonable inferences to be drawn from it, we conclude that the State's representations were clearly erroneous. Having found error, we must continue with our plain error analysis under both prongs.

¶ 71                                     a. First Prong

¶ 72         The next step in our analysis under the first prong is to determine whether the evidence was "damaging enough that it severely threatened to tip the scales of justice against the defendant." (Internal quotation marks omitted.) *Williams*, 2022 IL 126918, ¶ 57. To determine whether the evidence was, in fact, so closely balanced that an error severely threatened to tip the scales of justice against defendant, we conduct a qualitative, commonsense assessment of the evidence relating to the elements of the charged offense, as well as any evidence regarding the witnesses' credibility. *Id.* ¶ 58.

¶ 73         The sole element of the charge contested by defendant on appeal is that of identity. He argues that, with respect to identification of the man who fled from officers, the jury was faced with a credibility contest and two plausible versions of events. On one side, Birge and Troglia both testified that they knew defendant and he was the individual that fled. On the other, defendant testified the individual that fled was not him but another person, a friend whom he lent his car to

- 21 -

and who was wearing his clothing.

¶ 74        Following our review of the record, we are unable to conclude that the evidence in this case was closely balanced or that there were two plausible versions of events placed before the jury. Both Birge and Troglia testified that they recognized defendant as the man who fled and discarded the gun. Birge had arrested defendant previously and was familiar with him. During that arrest, defendant was wearing what Birge believed was the same red sweatshirt collected at the scene of the incident at issue. Birge stated that while seated in the patrol vehicle, he was able to get a look at defendant from 15 feet away while his face was illuminated under a streetlight. Troglia similarly testified that he was familiar with defendant from previous encounters and that he recognized defendant's face when illuminated under the streetlight, stating he was able to identify defendant from approximately 30 feet away. Troglia also previously arrested defendant while he was wearing a red sweatshirt. While not conclusive, the DNA evidence supports the officer's testimony. Defendant could not be excluded from the profile obtained from the handgun but almost certainly contributed the profile found on the red sweatshirt.

¶ 75        Although defendant admitted that he owned the vehicle from which the individual fled, he stated he let a friend borrow it. Defendant denied that he told Troglia he was unaware of who had his car. This friend was similar in physical stature to defendant, and the two shared clothes. Defendant kept clothing in his vehicle, and his friend likely put on his red sweatshirt. Defendant denied telling Troglia he did not own a red sweatshirt. Although defendant claimed it was his friend who was pounding on the apartment door and fled from police, he acknowledged that this friend lived at the apartment and would have had keys to enter the apartment, obviating a need to pound on the door for entry.

¶ 76        In sum, defendant was identified by two officers that he had fairly extensive prior

involvement with, that identification was generally supported by DNA evidence, and the version of events put forth by defendant does not appear plausible. The evidence in this case was not closely balanced.

¶ 77                                    b. Second Prong

¶ 78        Defendant also argues that the error committed by the prosecutor during closing arguments constituted second-prong plain error. Under the second prong, we determine whether the " 'error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Galarza*, 2023 IL 127678, ¶ 45 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). The Illinois Supreme Court has noted that "comments in prosecutorial closing arguments will rarely constitute second-prong plain error because the vast majority of such comments generally do not undermine basic protections afforded to criminal defendants." *Williams*, 2022 IL 126918, ¶ 56 (citing *People v. Moon*, 2022 IL 125959, ¶ 29, citing *Neder v. United States*, 527 U.S. 1, 8-9 (1999)).

¶ 79        We find that defendant has failed to establish second-prong plain error. We note that prior to closing argument, the trial court admonished the jurors as follows, "What the lawyers say during arguments is not evidence and should not be considered by you as evidence. If a lawyer makes a statement that is not based on the evidence or reasonable inferences to be drawn from the evidence, you should disregard the statement." Having received this admonishment, the jury was aware it should disregard comments in closing inconsistent with the evidence. See *People v. Macri*, 185 Ill. 2d 1, 52 (1998) (noting that any alleged error resulting from the prosecutor's argument would have been cured by the trial court's jury instructions); *Glasper*, 234 Ill. 2d at 215 (finding where the trial court properly instructed the jury, a prosecutor's improper argument was not so prejudicial that the jury ignored the court's instructions and based its verdict on such an argument).

Further, despite the improper argument from the prosecutor, defense counsel explained in his closing the true import of the forensic evidence as testified to by Gershburg—that defendant was identified as a possible contributor of the DNA on the handgun and the profile had an occurrence of one in five in the population at large.

¶ 80 Given the instructions and defense counsel's clarifying argument, this is not the kind of extreme circumstance where the prosecutor's improper argument during the initial closing argument amounted to structural error or second-prong plain error. See *People v. Albanese*, 104 Ill. 2d 504, 518 (1984) (finding plain error only where prosecutor's comments "were so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process"); *People v. Johnson*, 208 Ill. 2d 53, 85 (2003) (finding that "pervasive prosecutorial misconduct" amounts to structural error).

¶ 81 Turning to the comments challenged in the State's rebuttal, the prosecution stated:

"Now the 1 in 5 that he talks about, he goes, well, there is 15 males here, that means one of us [(the prosecution team)]—there is only one person in this courtroom that was out at Fair Oaks that night with that gun and it's him, the defendant, and that's what the science establishes and corroborates the two officers."

These comments fall far short of constituting reversible error. If these comments constituted the totality of the prosecution's argument on the DNA evidence found on the handgun, it would be unclear whether any error occurred at all.

¶ 82 Accordingly, the prosecutor's argument in closing did not equate to second-prong plain error, and we must honor defendant's procedural forfeiture.

¶ 83 2. *Ineffective Assistance of Counsel*

¶ 84 Defendant argues in the alternative that his counsel's failure to object to the improper closing argument constituted ineffective assistance of counsel.

¶ 85 Having found that the State's improper closing argument did not amount to plain error, defendant cannot establish ineffective assistance of counsel for a failure to preserve this issue. See *Glasper*, 234 Ill. 2d at 216 (finding the defendant could not meet the requirements to show ineffective assistance of counsel in the absence of plain error).

¶ 86 C. Jury Instruction

¶ 87 Defendant's final argument is that effective trial counsel would have tendered Illinois Criminal Pattern Jury Instructions, Criminal, No. 3.15 (approved July 28, 2017), and by failing to do so, his counsel rendered ineffective assistance. The particular jury instruction at issue provides that:

> "When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:
>
> [1] The opportunity the witness had to view the offender at the time of the offense.
>
> [2] The witness's degree of attention at the time of the offense.
>
> [3] The witness's earlier description of the offender.
>
> [4] The level of certainty shown by the witness when confronting the defendant.
>
> [5] The length of time between the offense and the identification confrontation." *Id.*

¶ 88 To prevail on an ineffective assistance claim, a defendant must demonstrate that

(1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance arguably prejudiced the defendant. *People v. Veach*, 2017 IL 120649, ¶ 30 (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). A failure to satisfy either prong precludes a finding of ineffectiveness. *People v. Simpson*, 2015 IL 116512, ¶ 35.

¶ 89    Regarding the first prong, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *People v. McGath*, 2017 IL App (4th) 150608, ¶ 38. Regarding prejudice, a defendant must demonstrate "that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland*, 466 U.S. at 694).

¶ 90    With regard to the selection of jury instructions, it is well established that, "[g]enerally, counsel's choice of what jury instructions to tender to the court is a matter of trial strategy." *People v. Bruemmer*, 2021 IL App (4th) 190877, ¶ 53. "Such decisions enjoy a strong presumption that they reflect sound trial strategy, rather than incompetence," and thus, they are "generally immune from claims of ineffective assistance of counsel." *People v. Enis*, 194 Ill. 2d 361, 378 (2000).

¶ 91    We have already found that the evidence in this case was not closely balanced. Given that defendant could not establish plain error, his claim of ineffective assistance of counsel fails due to his inability to establish prejudice. See *Glasper*, 234 Ill. 2d at 216. Moreover, defense counsel could have concluded that submitting this instruction would only aid the State in making arguments in support of its case while mitigating the aspersions defense counsel was casting on

the officers' identification of defendant. See *People v. Jones*, 2021 IL App (3d) 190131, ¶ 29 ( "By intentionally declining to have that instruction delivered, defense counsel was able to argue the shortcomings of the identifications *** while not calling any attention to factors that would actually hurt his case."). This is an eminently reasonable trial strategy, so trial counsel did not render ineffective assistance.

¶ 92                                III. CONCLUSION

¶ 93          For the reasons stated, we affirm the judgment of the trial court.

¶ 94          Affirmed.